

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

EXCAL ENTERPRISES, INC.,

Plaintiff,

vs.

Case No. 99-1776Civ-F25F

EP OPPORTUNITY FUND L.L.C.;
EISENBERG PARTNERS L.L.C.; JEFFREY
EISENBERG; WAVELAND PARTNERS; and
DAVID RICHTER,

Defendants.

_____/

## COMPLAINT

Plaintiff, EXCAL ENTERPRISES, INC. ("Excal"), sues Defendants, EP
OPPORTUNITY FUND L.L.C. (the "EP Fund"); EISENBERG PARTNERS L.L.C.
("Eisenberg Partners"); JEFFREY EISENBERG ("Eisenberg"); WAVELAND PARTNERS
("Waveland"); and DAVID RICHTER ("Richter") (collectively, the "Defendants"), and
alleges the following:

1.    Excal is a publicly traded Delaware corporation, whose securities are registered
with the Securities and Exchange Commission. Currently, Excal has 4,256,240 issued and
outstanding shares of common stock. Excal's principal place of business is located in Tampa,
Hillsborough County, Florida.

2.    The EP Fund is a Delaware limited liability company, with its principal place of
business in Chicago, Illinois. The EP Fund owns 600,000 shares of Excal common stock,
which represents 14.1% of the issued and outstanding stock of Excal..

T0002 72
# 150.00

005.137640.1

3.      Eisenberg Partners is a Delaware limited liability company, with its principal place of business in Chicago, Illinois, and is the sole manager of the EP Fund.

4.      Eisenberg is the sole manager of Eisenberg Partners and, upon information and belief, is a resident of the State of Illinois.  Eisenberg, through Eisenberg Partners, directly controls the voting of the Excal shares owned by the EP Fund.

5.      Upon information and belief, Waveland owns approximately 196,604 shares of Excal common stock, which represents 4.6% of the issued and outstanding stock of Excal. Because Waveland apparently holds its shares as an "objecting beneficial owner" and is not required to disclose its identity to the investing public or the company, Excal does not know precisely the name of Waveland, its corporate or partnership structure, or how it holds its shares.

6.      Upon information and belief, Richter is the person having direct control over the affairs Waveland, including how Waveland votes its Excal stock.  As described below, Richter has held himself out to Excal as the person having the authority to negotiate on behalf of Waveland.

7.      This Court has jurisdiction of this action pursuant 28 U.S.C. § 1331, 15 U.S.C. §78aa, and 28 U.S.C. § 2201.

8.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b), in that substantial parts of the events giving rise to these claims occurred in the Middle District of Florida.

9.      On or about May 18, 1999, Richter called the offices of Excal, identified himself as Waveland's representative, and inquired whether the company would be willing to buy Waveland's 196,604 shares at the current market bid price.  Excal responded that it was

interested in repurchasing Waveland's shares pursuant to the company's publicly announced intention to repurchase shares.

10.     On May 20, 1999, Excal telephoned Richter to follow-up regarding the potential purchase of Waveland's shares, at which time Richter said that he had a "friend" (the "Unknown Shareholder") who was also interested in selling, which would bring the total number of shares to be purchased by Excal to 330,000.  Richter, however, stated that he had "another bidder" for the block of shares and needed to give the other bidder time to put its financing together.  At present, the identity of the Unknown Shareholder is not known to Excal; however, upon the facts currently available, Excal believes that this person is acting in concert with the EP Fund, Eisenberg Partners, Eisenberg, Waveland, and Richter, and will seek to amend this Complaint to assert claims against the Unknown Shareholder when his identity is discovered.  The EP Fund, Eisenberg Partners, Eisenberg, Waveland, Richter, and the Unknown Shareholder are hereinafter collectively referred to as the "Eisenberg Group."

11.     On May 21, 1999, Excal received a call from a Texas resident, who identified himself as David Gidel.  Mr. Gidel left a message that he was interested in purchasing Excal's stock from another unidentified shareholder.

12.     On May 24, 1999, Excal returned Mr. Gidel's May 21 telephone call and left a message.

13.     On May 28, 1999, Excal telephoned Richter to follow-up about purchasing Waveland's and the Unknown Shareholder's shares, but Richter responded that he and the Unknown Shareholder were going to "keep their shares for right now."

14.    On June 8, 1999, Excal received a facsimile transmission from a Mr. Robert Gidel ("Gidel"), which stated that he was interested in buying Excal stock from another Excal shareholder and wanted information on Excal's potential tax liability.

15.    On June 9, 1999, Excal returned Gidel's June 8 telephone call.  When Excal inquired how Gidel heard of its stock (Excal's stock is thinly traded), he responded that he learned about Excal while doing business with Prudential in Jacksonville (Excal has a warehouse/office building in Jacksonville).  During the telephone conversation, Excal inquired whether Gidel knew of Eisenberg, and whether he learned about Excal through Eisenberg. Gidel emphatically denied knowing Eisenberg.

16.    On June 10, 1999, Gidel placed a telephone call to Excal, during which he informed Excal that he had misled Excal on June 9, 1999, when he stated that he did not know of Eisenberg.  Gidel then informed Excal that he was contemplating buying Excal shares from **"Richter, who is friends with Jeff Eisenberg."**

17.    Excal's annual meeting of the shareholders is presently set to occur on August 5, 1999, in Tampa, Florida.

18.    Excal and the EP Fund are currently engaged in a "proxy fight."  Excal has mailed to its shareholders a proxy statement, a copy of which is attached hereto as Exhibit "A," and a supplement, a copy of which is attached hereto as Exhibit "B," which solicits shareholders' proxies in favor of Excal's recommended vote and against EP Fund.

19.    EP Fund has mailed to the Excal shareholders its proxy statement, a copy of which is attached hereto as Exhibit "C," which requests the Excal shareholders to vote Eisenberg into Excal's Board of Directors as a Class I director, to adopt a proposal amending Excal's Second Amended and Restated Bylaws to provide that all actions taken by the Board of

Directors must be done by the **unanimous** vote of all of the directors then holding office (the

"Unanimous Director Vote Provision"), and requiring the affirmative vote of at least 75% of

Excal's issued and outstanding shares entitled to vote to amend the unanimous director vote

provision (the "Super-Majority Provision").

20.     On or about April 18, 1994, Excal adopted a Rights Agreement, a copy of

which is attached hereto as and incorporated by reference herein as Exhibit " D." The Rights

Agreement provides, inter alia, that when an "Acquiring Person," as that term is defined in

the Rights Agreement, and which term includes a group of persons or entities who have "any

agreement, arrangement, or understanding, whether or not in writing, for the purpose of

acquiring, holding, voting . . . or disposing of any securities of the Company" (Rights

Agreement, Section 1(d)(iii)), acquires greater than 15% of Excal's issued and outstanding

shares, a provision is triggered that gives all of the non-Acquiring Persons (Excal shareholders

who are not a part of the Acquiring Person group) the right to purchase additional preferred

stock in Excal, thereby diluting the holdings of the Acquiring Persons.

21.     All conditions precedent to filing this action have been performed, waived, or

have otherwise occurred.

### COUNT I - VIOLATION OF SECTION 13D

22.     Excal realleges and incorporates herein by reference paragraphs 1 through 21 of

this Complaint.

23.     This an action for injunctive relief to cure existing violations of Section 13(d) of

the Securities Exchange Act of 1934, and to prevent harm from arising from such violations.

24.     Section 13(d) of the Securities Exchange Act of 1934 requires any person or

group of persons who acquire the beneficial ownership of more than 5% of the class of stock

to send the issuer of the stock, by registered or certified mail, a statement containing the information required by Schedule 13-D. The Schedule 13-D must be sent within ten days after the person or group acquires this stock. The Schedule 13-D must reveal the following information:

      a.    The background, identity, residence, and citizenship of, and the nature of such beneficial ownership by, an acquiring person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

      b.    The source and amount of the funds or other consideration used or to be used in making the purchases;

      c.    Any plans or proposals which the acquiring person may have to liquidate the issuer, sell its assets or merge it with any other persons, if the purpose of the stock purchases is to acquire control of the business;

      d.    The number of shares which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by the acquiring person or any associate of such person; and

      e.    Information regarding any contracts, arrangements or understandings with any person regarding any securities of the issuer.

25.    The Eisenberg Group violated Section 13(d) by failing to file an accurate Schedule 13-D, which states that the EP Fund, Eisenberg Partners, Eisenberg, Waveland, Richter, and the Unknown Sharholder are operating as a group, as that term is defined in 15 U.S.C. § 78(m)(d)(1) and Rule 13d-1(a) of the Regulations Under the Securities Exchange Act of 1934.

26.    Excal has no adequate remedy at law.

27.    Excal has a clear legal right to the injunctive relief requested.

28.    Unless the injunctive relieve requested herein is granted, Excal will suffer irreparable harm, in that the Eisenberg Group's shares will be voted at the August 5, 1999 annual shareholders' meeting without the group having given the investing public full disclosure of the group's intentions and activities, and the Unanimous Director Vote Provision and the Super-Majority Provision could be enacted thereby deadlocking Excal's Board of Directors and disenfranchising Excal's shareholders

29.    Public policy supports the issuance of the requested injunctive relief to Excal.

WHEREFORE, Excal demands that this Court:

a.    Enter a preliminary and permanent injunctions enjoining all Defendants and the Unknown Shareholder from exercising any voting rights, including voting rights in connection with the August 5, 1999 annual shareholder meeting;

b.    Require all members of the Eisenberg Group to file a Schedule 13-D, which accurately reflects all information required by law, including the fact that they are operating as a group;

c.    Award Excal its costs incurred in bringing this action; and

d.    Award such other and further relief as this Court deems just and appropriate.

## COUNT II – DECLARATORY JUDGMENT

30.    Excal incorporates herein by reference paragraphs 1 through 21 of this Complaint.

31.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

32.    The Rights Agreement provides, inter alia, that when an "Acquiring Person," as that term is defined in the Rights Agreement, and which term includes a group of persons or entities who have "any agreement, arrangement, or understanding, whether or not in writing, for the purpose of acquiring, holding, voting . . . or disposing of any securities of the Company" (Rights Agreement, Section 1(d)(iii)), acquires greater than 15% of Excal's issued and outstanding shares, a provision is triggered that gives all of the non-Acquiring Persons (Excal shareholders who are not a part of the Acquiring Person group) the right to purchase additional preferred stock in Excal, thereby diluting the holdings of the Acquiring Persons

33.    Based upon the facts currently available, Excal reasonably believes that the Eisenberg Group is an "Acquiring Person," as that term is defined in the Rights Agreement, in that the group appears to have an "agreement, arrangement, or understanding, whether or not in writing, for the purpose of acquiring, holding, voting . . . or disposing of any securities of the Company."

34.    Accordingly, based upon the facts currently available, Excal believes that the Rights Agreement has been triggered and the non-Acquiring Person shareholders are entitled to purchase preferred shares of Excal stock pursuant to the Rights Agreement.

35.    An actual controversy exists concerning whether the Rights Agreement has been triggered.

WHEREFORE, Excal demands that this Court enter a judgment declaring that the Eisenberg Group has triggered the terms of the Rights Agreement and that all non-Acquiring Person Excal shareholders are entitled to purchase additional preferred shares of Excal stock pursuant to Rights Agreement, and award Excal its costs and such other and further relief as this Court deems just and appropriate.

36.    Excal incorporates herein by reference paragraphs 1 through 21 of this Complaint.

37.    This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

38.    Because the Unanimous Director Vote Provision and the Super-Majority Provision proposed in the proxy statement submitted by the EP Fund to the Excal shareholders would create a deadlocked board, and because it would take greater than 75% of the issued and outstanding shares of Excal entitled to vote to repeal such a provision, the EP Fund's proxy statement and proposed voting items are violative of Delaware corporate law.

39.    An actual controversy exists concerning whether the Unanimous Director Vote Provision and the Super-Majority Provision are violative of Delaware law.

WHEREFORE, Excal demands that this Court enter a judgment declaring that the Unanimous Director Vote Provision and the Super-Majority Provision are violative of Delaware law, and award Excal its costs and such other and further relief as this Court deems just and appropriate.

JAMES M. LANDIS
Florida Bar No. 116760
RICHARD THOMAS PETITT
Florida Bar No. 878995
Foley & Lardner
100 N. Tampa Street, Suite 2700
Post Office Box 3391
Tampa, FL 33601-3391
(813) 229-2300
(813) 221-4210  (facsimile)
Attorneys for Plaintiff

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 G373FTa5YfaRJ5FCGT982JdhPe3afYj9Mz8Wzdp95/YapeViVLCb/d809NHqyceX
 5aGhOC+pdve6WvRq1g2qaw==

<SEC-DOCUMENT>0000832813-99-000007.txt : 19990701
<SEC-HEADER>0000832813-99-000007.hdr.sgml : 19990701
ACCESSION NUMBER:               0000832813-99-000007
CONFORMED SUBMISSION TYPE:      DEF 14A'
PUBLIC DOCUMENT COUNT:          1
CONFORMED PERIOD OF REPORT:     19990628
FILED AS OF DATE:               19990630

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:          EXCAL ENTERPRISES INC
                CENTRAL INDEX KEY:               0000832813
                STANDARD INDUSTRIAL CLASSIFICATION:  SPECIAL INDUSTRY MACHINERY
                IRS NUMBER:                      592855398
                STATE OF INCORPORATION:          DE
                FISCAL YEAR END:                 0331

        FILING VALUES:
                FORM TYPE:           DEF 14A
                SEC ACT:
                SEC FILE NUMBER:     000-17069
                FILM NUMBER:         99656330

        BUSINESS ADDRESS:
                STREET 1:            100 N TAMPA ST
                STREET 2:            STE 3575
                CITY:                TAMPA
                STATE:               FL
                ZIP:                 33602
                BUSINESS PHONE:      8132240228

        MAIL ADDRESS:
                STREET 1:            100 NORTH TAMPA ST SUITE 3575
                STREET 2:            100 NORTH TAMPA ST SUITE 3575
                CITY:                TAMPA
                STATE:               FL
                ZIP:                 33602

        FORMER COMPANY:
                FORMER CONFORMED NAME:  ASSIX INTERNATIONAL INC
                DATE OF NAME CHANGE:    19920703
</SEC-HEADER>
<DOCUMENT>
<TYPE>DEF 14A
<SEQUENCE>1
<TEXT>
```



EXHIBIT

A

```
                      SCHEDULE 14A INFORMATION
          Proxy Statement Pursuant to Section 14(a) of the
                   Securities Exchange Act of 1934
                      (Amendment No. ____)
```

Filed by the Registrant [ X ]
Filed by a Party other than the Registrant [  ]

Check the appropriate box:

[  ]              Preliminary Proxy Statement
[  ] Confidential, for Use of the Commission Only (as
          permitted by Rule 14a-6(e)(2))
[X]  Definitive Proxy Statement
[  ] Definitive Additional Materials
[  ] Soliciting Material Pursuant to  240.14a-11(c) or  240.14a-12

```
                        Excal Enterprises, Inc.
            ------------------------------------------------
             (Name of Registrant as Specified in its Charter)


             ----------------------------------------------------------
            (Name of Person(s) Filing Proxy Statement, if other than the Registrant)
```

Payment of Filing Fee (Check the appropriate box):

[X]   No fee required.

[  ] Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

    1)  Title of each class of securities to which transaction applies:

    2)  Aggregate number of securities to which transaction applies:

    3)  Per unit price or other underlying value of transaction computed
pursuant to Exchange Act Rule 0-11 (Set forth the amount on which     the
filing fee is calculated and state how it was determined):

    4)  Proposed maximum aggregate value of transaction:

    5)  Total fee paid:

[  ] Fee paid previously with preliminary materials.

[  ] Check box if any part of the fee is offset as provided by Exchange Act
     Rule 0-11(a)(2) and identify the filing for which the offsetting fee was
     paid previously.  Identify the previous filing by registration statement
     number, or the Form or Schedule and the date of its filing.

    1)  Amount Previously Paid:

    2)  Form, Schedule or Registration Statement No.:

    3)  Filing Party:

    4)  Date Filed:

NOTICE AND PROXY STATEMENT

NOTICE OF ANNUAL MEETING OF SHAREHOLDERS
TO BE HELD JULY 28, 1999

June 28, 1999

Dear Excal Shareholder:

PLEASE TAKE NOTICE that the annual meeting of shareholders of Excal Enterprises, Inc. will be held on Thursday, August 5, 1999, at 1:30 p.m., local time, at the University Club located on the 38th floor of One Tampa City Center, Tampa, Florida.

The meeting will be held for the following purposes:

1.   To elect one Class I Director to serve for a three-year term expiring at the annual meeting of shareholders to be held in 2002 and until his successor is elected and qualified.

2.   To ratify the selection of Pender Newkirk & Company as independent auditors for the current fiscal year ending March 31, 2000.

3.   To transact such other business as may properly come before the meeting or any adjournment thereof.

The shareholders of record at the close of business on June 22, 1999 will be entitled to vote at the annual meeting.

It is hoped you will be able to attend the meeting, but in any event we would appreciate your dating, signing and returning the enclosed proxy as promptly as possible.  If you are present at the meeting, you may revoke your proxy and vote in person.

Sincerely,

W. Carey Webb
President and Chief Executive Officer

EXCAL ENTERPRISES, INC.

100 North Tampa Street, Suite 3575
Tampa, Florida 33602

PROXY STATEMENT

This Proxy Statement and the enclosed form of proxy are being sent to stockholders of Excal Enterprises, Inc. (the "Company") on or about June 28, 1999 in connection with the solicitation of proxies by the Company's Board of Directors to be used at the Annual Meeting of Shareholders of the Company. The meeting will be held on August 5, 1999, at 1:30 p.m., local time, at the University Club located on the 38th floor of One Tampa City Center, Tampa, Florida.

The Board of Directors has designated W. Carey Webb and Timothy R. Barnes, and each or either of them, with full power of substitution, as proxies to vote the shares of common stock solicited on its behalf. The form of proxy is in ballot form so that a specification may be made to indicate approval or disapproval of, or to abstain with respect to, each of the proposals. All shares represented by proxies will be voted in accordance with the specifications marked thereon or, if no specifications are made, will be voted "for" each of the proposals. Any stockholder giving a proxy may revoke the same at any time by (i) giving written notice of revocation to the Secretary of the Company, (ii) by submitting a later dated proxy with a different vote; or (iii) by attending the meeting and voting in person. The shares represented by the proxy will be voted unless the proxy is mutilated or otherwise received in such form or at such time as to render it not votable.

VOTING SECURITIES

The record of stockholders entitled to vote was taken at the close of business on June 22, 1999 (the "Record Date"). At such date, the Company had outstanding and entitled to vote 4,256,240 shares of Common Stock, $0.001 par value (the "Common Stock"). Each share of Common Stock entitles the holder to one vote. Holders of a majority of the votes must be present in person or represented by proxy to constitute a quorum at the annual meeting.

The following table sets forth information, to the best of the Company's knowledge, relating to the beneficial ownership of Common Stock as of the Record Date of each person known to the Company to be the beneficial owner of more than five percent (5%) of the Common Stock, for each director and each executive officer of the Company named in the Summary Compensation Table elsewhere in this Proxy Statement and for all directors and executive officers as a group. Except as otherwise indicated, the persons shown exercise sole voting and investment power over the shares. Where indicated in footnotes to the table, share ownership includes shares subject to options or warrants that are presently exercisable or will become exercisable within 60 days of the date of this Proxy Statement.

| Name of Beneficial Owner | Shares of Common Stock Beneficially Owned | Percentage of Class |
|---|---|---|
| R. Park Newton, III<1> | 1,493,812<2> | 32.2% |
| EP Opportunity Fund, LLC<3> | 600,000 | 14.1% |
| Gotham Partners, L.P.<4> | 580,500 | 13.6% |
| W. Carey Webb | 250,000<5> | 5.8% |
| W. Aris Newton | 127,700<6> | 3.0% |

| | | |
|---|---|---|
| John L. Caskey | 84,700<7> | 2.0% |
| Timothy R. Barnes | 75,000<8> | 1.8% |
| All directors and executive officers as a group (5 persons) | 2,031,212<9> | 42.5% |

<1>  The business address of Mr. Newton is 100 North Tampa Street, Suite 3575, Tampa, Florida 33602.

<2>  Includes (1) 650,472 shares owned jointly by Mr. Newton and his wife over which Mr. Newton holds shared voting and investment power, (2) 200 shares owned directly, (3) 1,000 shares owned directly by his wife, as to which Mr. Newton disclaims any beneficial ownership, (4) 452,500 shares held in a limited partnership for the benefit of certain members of Mr. Newton's family, over which Mr. Newton and his wife have shared voting and investment power, and (5) 389,640 shares subject to warrants and options.

<3>  EP Opportunity Fund, LLC ("EPOF"), a Delaware limited liability company, has sole power to vote and to dispose of the common stock. Eisenberg Partners, LLC, a Delaware limited liability company ("Eisenberg Partners"), is the sole manager of EPOF.  Jeffrey Eisenberg is a US citizen whose principal occupation is managing the affairs of Eisenberg Partners and through such entity the affairs of EPOF.  The business address of EPOF, Eisenberg Partners and Mr. Eisenberg is 33 West Monroe Street, 21st Floor, Chicago, Illinois 60603.

<4>  Gotham Partners, LP ("Gotham") and Gotham Partners III, LP ("Gotham III"), New York limited partnerships, have the voting and dispositive power over 573,815 and 6,685 shares, respectively. Section H Partners, a New York limited partnership, is the sole general partner of Gotham and Gotham III.  Karenina Corporation, LP, a New York corporation wholly owned by Mr. William A. Ackerman, and DPB Corp., a New York corporation wholly owned by Mr. David P. Berkowitz, are the sole general partners of Section H Partners, LP.  The business address of Gotham, Gotham III, Section H Partners, LP, Karenina Corporation, DPB Corp., Mr. Ackerman and Mr. Berkowitz is 110 East 42nd Street, 18th Floor, New York, New York 10017.

<5>   Includes options to purchase 78,837 shares.

<6>   Includes options to purchase 19,736 shares.

<7>  Includes options to purchase 12,448 shares.

<8>  Includes options to purchase 21,712 shares.

<9>  Consists of the shares listed in the table that are deemed to be beneficially owned by Messrs. R. Park Newton, III, Webb, Caskey, W. Aris Newton and Barnes.


    SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

     Under Section 16 of the Securities Exchange Act of 1934, officers, directors and beneficial owners of more than 10% of Company's Common Stock are required to file reports with the Securities and Exchange Commission on Forms 3, 4 and 5 with respect to their ownership of Common Stock and acquisitions and dispositions thereof.  Based on a review of Forms 3, 4 and 5 submitted to the

Company during the fiscal year ended March 31, 1999, none of the Company's officers, directors, or beneficial owners of more than 10% of the Company's Common Stock were delinquent in their Section 16 filings.

PROPOSAL 1
ELECTION OF DIRECTORS

The Company's Certificate of Incorporation, as amended, divides the Board of Directors into three classes. At the meeting, one Class I director will be elected to serve for a term of three years and until his successor is elected and qualified. The Board of Directors has nominated Mr. John L. Caskey, the current Class I director, to stand for reelection at the meeting. Directors will be elected by a plurality of votes cast by shares entitled to vote at the meeting. The accompanying proxy will be voted, if authority to do so is not withheld, for the election as a director of John L. Caskey. Mr. Caskey is presently available for election and is a member of the Board. If Mr. Caskey should become unavailable, which is not now anticipated, the persons voting the accompanying proxy may in their discretion vote for a substitute.

Information concerning each of the Company's directors, including the Class I director standing for reelection, and executive officers is set forth below. R. Park Newton, III and W. Aris Newton are brothers.

R. Park Newton, III, Chairman of the Board of Directors (age 55): Mr. Newton has been a Director of the Company since July 1986 and serves as a member of the Board's compensation committee. Mr. Newton served as President and Chief Executive Officer of the Company from its inception until August 15, 1994, when he resigned those positions and became Chairman of the Company's Board of Directors. Mr. Newton served as the Company's Secretary and Treasurer from February 1995 until September 1995 when Mr. Newton resigned from all officer positions of the Company and its subsidiaries. Mr. Newton has been engaged in various private business ventures during the past five years that have included, among other things, investments in real estate. Mr. Newton attended Clemson University.

W. Aris Newton, Director and Vice President of the Company and President of Jacksonville Holdings, Inc. (age 46): Mr. Newton has been a Director of the Company since January 1992, a Vice President of the Company since April 1993, and has served as an employee in manufacturing, sales and management related capacities since 1988. Mr. Newton is a member of the Board's audit committee. Mr. Newton attended Clemson University.

John L. Caskey, Director (age 53): Mr. Caskey has been a Director of the Company since March 1993. Mr. Caskey is a member of the Board's audit and compensation committees. Mr. Caskey has served since June 1985 as President and CEO of Casco, Inc., an investment company that handles investments in mortgages, real estate, joint ventures and emerging companies. Mr. Caskey owned and operated Admiral Air from 1996 through 1998, a company providing pneumatic tool repair. Mr. Caskey also served as President of All American Security, Inc. from July 1991 until November 1995 when it was sold. All American Security, Inc. provided home security for fire, health and theft through the use of monitoring and detection devices. Mr. Caskey

received a bachelor's degree from the University of South Florida.

W. Carey Webb, President and Chief Executive Officer of the Company (age 54): Mr. Webb was appointed President and Chief Executive Officer of the Company on August 15, 1994. Mr. Webb was an independent economic consultant to the Company pursuant to an Agreement for Consulting Services dated December 16, 1992 with respect to matters associated with the Confidential Settlement Agreement entered into with Sears. Prior to his employment by the Company in August 1994, Mr. Webb served as General Manager to TAW, Inc., a supplier of electrical components. Mr. Webb served as an independent economic and management consultant to various enterprises from 1991 to 1993 and, prior thereto, served as Executive Vice-President of Precision Enterprises, Inc., an entity that owns various automobile dealerships. Previously, Mr. Webb spent approximately 17 years at Linder Industrial Machinery, Inc. in various management capacities. Mr. Webb received a bachelor's degree from Georgia Institute of Technology and a Masters of Business Administration from Emory University.

Timothy R. Barnes, Vice President, Secretary, Treasurer and Chief Financial Officer (age 41): Mr. Barnes joined the Company on August 7, 1995 as Vice President and Chief Financial Officer. He was appointed Secretary/Treasurer on September 27, 1995. Prior to joining the Company, Mr. Barnes served as Senior Vice President, Secretary, Treasurer and Chief Financial Officer of Medcross, Inc., a publicly-held company providing outpatient health care services. He is a certified public accountant and holds a Bachelor of Arts degree in Business Administration (Accounting) and a Masters of Business Administration, both from the University of South Florida.

Board of Directors and Board Committees. The Board of Directors held no formal meetings, but executed several written actions by unanimous consent after informal discussion during the fiscal year ended March 31, 1999. The Board of Directors has established two standing committees: an audit committee and a compensation committee. The Board does not have a nominating committee.

Audit Committee. The audit committee is comprised of John L. Caskey and W. Aris Newton. The principal responsibilities of the audit committee are reviewing the Company's internal controls and the objectivity of its financial reporting, making recommendations regarding the engagement of the Company's independent auditors and reviewing the annual audit with the auditors. The audit committee did not hold any meetings independent of discussions of the full board of directors during fiscal 1999.

Compensation Committee. The compensation committee is comprised of R. Park Newton, III and John L. Caskey. The compensation committee is responsible for approving compensation arrangements for senior management. During fiscal 1999, the compensation committee did not hold any meetings independent of discussions of the full board of directors.

Compensation of Directors. The directors of the Company each receive a $1,000 monthly allowance for serving as a board member. No additional compensation is paid for serving on the audit and compensation committees or attendance at committee meetings. Each director was paid $9,000 for services rendered as a director to Excal Enterprises during the nine-month fiscal year ended March 31, 1999.

While directors are entitled to reimbursement for reasonable travel
expenses incurred in attending such meetings, no reimbursements were
requested during fiscal 1999.

## EXECUTIVE COMPENSATION

The following table summarizes the compensation paid or accrued
by the Company to its Chief Executive, its Chairman of the Board, and
its Chief Financial Officer (the "named executives") for services
rendered during the nine-month fiscal year ended March 31, 1999 and
the fiscal years ended June 30, 1998 and June 30, 1997.  No other
executive officers had total salary and bonus that exceeded $100,000
during the nine-month fiscal year ended March 31, 1999.

<TABLE>

### SUMMARY COMPENSATION TABLE

<CAPTION>

| (a)<br>Name and<br>Principal Position | (b)<br>Year | Annual Compensation | | (e)<br>Other<br>Annual<br>Compen-<br>sation | (<br>Rest<br>St<br>Awa |
| --- | --- | --- | --- | --- | --- |
| | | (c)<br>Salary<F1> | (d)<br>Bonus<F1> | | |
| <S> | <C> | <C> | <C> | <C> | <C> |
| W. Carey Webb | 1999 | $154,080 | $75,000 | <F*> | |
| President and Chief | 1998 | 205,440 | 62,500 | <F*> | |
| Executive Officer | 1997 | 198,720 | 50,000 | <F*> | |
| R. Park Newton, III | 1999 | 144,450 | 75,000 | <F*> | |
| Chairman of the Board | 1998 | 192,600 | 62,500 | <F*> | |
| | 1997 | 186,300 | 100,000 | <F*> | |
| Timothy R. Barnes | 1999 | 64,200 | 37,500 | <F*> | |
| Vice President, Secretary | 1998 | 85,600 | 31,250 | <F*> | |
| Treasurer and | 1997 | 82,800 | 25,000 | <F*> | |
| Chief Financial Officer | | | | | |

<FN>
<F*>
  Less than 10% of salary and bonus.

<F1>
  Amounts shown include cash and non-cash compensation earned and
  received by executive officers as well as amounts earned but
  deferred at the election of those officers.  Amounts shown for
  fiscal 1999, which consisted of nine months, have not been
  annualized.

<F2>
  Represents the cost of life insurance in excess of $50,000 each
  year, $9,000 for serving on the board of Jacksonville Holdings in
  1999 and 1998 and 401(k) contributions of $1,986, $2,679 and $707
  in 1999, 1998 and 1997, respectively.

<F3>

Represents compensation for serving on the Board of Directors of
Excal Enterprises and Jacksonville Holdings and 401(k)
contributions of $1,598, $2,346 and $1,413 in 1999, 1998 and 1997,
respectively.

\<F4\>
  Represents 401(k) contributions.

\<F5\>
  Includes options to acquire 300,000 shares at $1.00 per share that
  were awarded in 1994 but were not issued until January 1999 because
  of a requirement that the Board of Directors take certain actions
  prior to issuing such options.
\</FN\>
\</TABLE\>

    Options.  The following table sets forth certain information with
respect to options granted during the fiscal year ended March 31, 1999
to the named executives.

\<TABLE\>

OPTION/SAR GRANTS IN LAST FISCAL YEAR<br>Individual Grants

\<CAPTION\>

| Name | Number of Securities Underlying Options/SARs Granted (#) | Percent of Total Options/SARs Granted to Employees in Fiscal Year | Exercise Base Pric ($/Sh) |
| --- | --- | --- | --- |
| \<S\> | \<C\> | \<C\> | \<C\> |
| W. Carey Webb | 78,837 | 10.9% | $4.87 |
| R. Park Newton, III | 106,285 | 14.7% | 4.87 |
| R. Park Newton, III | 300,000\<F1\> | 41.5%\<F1\> | 1.00 |
| R. Park Newton, III | 183,355 | 25.5% | 2.93 |
| Timothy R. Barnes | 21,712 | 3.0% | 4.87 |

\<FN\>
\<F1\>
  Includes  options to acquire 300,000 shares at $1.00 per share  that
  were  awarded in 1994 but were not issued until January 1999 because
  of  a  requirement that the Board of Directors take certain  actions
  prior  to  issuing  such options.  The closing bid  price  of  the
  Company's  Common Stock was $0.75 and $2.9375 on the  date  of  the
  option award and issuance, respectively.
\</FN\>
\</TABLE\>

    The  following table sets forth certain information with respect  to
to  options exercised during fiscal 1999 by the named executives  and
with  respect to unexercised options held by each such person  at  the
end of fiscal 1999.

\<TABLE\>

AGGREGATED OPTION/SAR EXERCISES IN LAST FISCAL YEAR<br>AND FISCAL YEAR-END OPTIONS/SAR VALUES

\<CAPTION\>

Number of Securi
Underlying Unexer
Options/SARs at FY-

| Name | Shares Acquired on Exercise (#) | Value Realized($) | Exercisable | Unex |
| --- | --- | --- | --- | --- |
| `<S>` | `<C>` | `<C>` | `<C>` | `<C>` |
| W. Carey Webb | 250,000 | $282,500 | 78,837 | |
| R. Park Newton, III | 500,000 | $500,000 | 183,355 | |
| W. Aris Newton | 70,000 | $106,875 | 19,736 | |
| Timothy R. Barnes | 75,000 | $107,775 | 21,712 | |

`<FN>`
`<F1>`
   Based on closing bid price of the Company's Common Stock of $3.00
at March 31, 1999.

   Employment Contracts and Termination of Employment and Change-in-
control Arrangements.  The Company has an employment agreement with R.
Park Newton, III, the Company's Chairman of the Board and a director,
that extends through March 8, 2004.  Mr. Newton's current base salary
is $192,600 per year subject to review annually or more frequently, if
appropriate, by the Board of Directors or the Board's compensation
committee.  The employment agreement also provides for a company
provided automobile, comprehensive medical coverage and other fringe
benefits.

   The Company has an employment agreement with W. Carey Webb, its
President and Chief Executive Officer, that extends through August 15,
2004.  Mr. Webb's current base salary is $205,440 per year subject to
review annually or more frequently, if appropriate, by the Board of
Directors or the Board's compensation committee.  The employment
agreement also provides for a performance/incentive bonus to be paid
to Mr. Webb as determined by the Board of Directors or its
compensation committee.  Mr. Webb's employment agreement also
obligates the Company to reimburse Mr. Webb for reasonable moving
expenses incurred in connection with his relocation to Tampa, Florida
and for the amount, not to exceed $100,000, by which the net sales
proceeds of the sale of his Lakeland residence are less than the
appraised value of that residence.  To date, Mr. Webb has elected to
commute and has not relocated.  Mr. Webb's employment agreement also
provides Mr. Webb with a Company automobile and reimbursement of
related operating expenses, comprehensive medical coverage and other
fringe benefits.

   The Company has an employment agreement with Timothy R. Barnes,
its Vice President and Chief Financial Officer, that extends through
August 7, 1999.  The employment agreement automatically renews for
additional one-year periods unless either party provides a 90-day
notice of non-renewal.  Mr. Barnes' current base salary is $85,600 per
year subject to review annually or more frequently, if appropriate, by
the Board of Directors or the Board's compensation committee.

   In the event any of the executives' employment is terminated for
cause, the executive will be entitled to his accrued base salary and
reimbursement for any expenses incurred through the date of
termination.  In the event the executive is terminated without cause,
he will be entitled to his base salary accrued through the date of
termination and reimbursement for expenses incurred through the date
of termination, as well as base salary and fringe benefits which would

have been payable during the remainder of the term of his employment agreement. Each of the executives' employment agreements contain a non-compete provision under which the executive may not compete with the Company during the term of the agreement and, in the case of his termination for cause, for a period of six months thereafter. The executive also agrees during those same periods not to interfere with or seek to employ any of the Company's employees.

Each of the executives is also entitled to certain payments upon a "change of control" of the Company. A "change of control" is deemed to have occurred in the event of (i) the acquisition by any person beneficially of 30% or more of the outstanding shares of voting capital stock, (ii) the sale or transfer of greater than 50% of the book value of the Company's assets, (iii) the merger, consolidation, share exchange or reorganization of the Company as a result of which the holders of all of the shares of capital stock of the Company as a group would receive less than 50% of the voting power of the capital stock of the surviving corporation, (iv) the commencement of a tender offer which, if successful, would result in a change of control, or (vi) a determination by the Board of Directors in view of then current circumstances or impending events that a change of control has occurred or is imminent. At any time within six months of the "change of control," or within three years following a "change of control" in the event that: (i) the executive's employment is terminated without cause; or (ii) he is removed from the offices he holds or (iii) his power and authority is reduced below that generally commensurate with the position of the offices he holds, or (iv) a Company-required relocation outside of Tampa, Florida, the executive is allowed to terminate the employment agreement and receive a one-time lump sum severance payment equal to two and nine-tenths times the total amount of the current annual base salary payable to him. Certain provisions limit and adjust the severance benefits payable to the executive following a "change of control" in the event counsel to the Company determines that such payments would constitute "parachute payments" within the meaning of the Internal Revenue Code of 1986, as amended. In the event of a "change of control", the executive shall also have the right to compel the Company to purchase any outstanding options at a price equal to the greater of $7.50 per share or the average of the closing bid and asked prices on the day preceding the "change of control."

Indebtedness of Management. The Board of Directors determined that it would be in the best interests of the Company and its shareholders to further align the long term economic interests of management with the long term economic interest of the shareholders. Therefore, to encourage management to exercise their stock options, the Board of Directors approved recourse loans to certain officers and directors in the amount of the exercise price of options held by them. The loans require interest to be paid annually at a rate of 5.57%, with the principal amount due in September 2003. The amount loaned to each officer or director was as follows: W. Carey Webb - $282,500; Timothy R. Barnes - $107,775; W. Aris Newton - $106,875; and, John L. Caskey - $81,875.

Indemnification of Company Officers and Directors. The Company has entered into Indemnity Agreements with each of its officers and directors under which the Company agrees to indemnify and hold the officers and directors harmless against all expenses, judgments, fines, penalties, etc. reasonably incurred by him in connection with his service to the Company; provided, however, that such

indemnification only applies following a specific determination that the officers and directors acted in good faith and in a manner he reasonably believed to be in or not opposed to, the best interest of the Company and that such indemnification is otherwise proper under the provisions of the Delaware General Corporation Law.

The Board of Directors previously authorized the advance of costs and expense incurred by R. Park Newton, III, the Company's current Chairman of the Board and a director, as well as those costs and expenses incurred by Douglas Gardner, Richard Russell, Charles Ross, Richard W. Brewer and George Crook, all of whom are former officers, directors, employees or agents of the Company, in connection with an investigation by the Securities and Exchange Commission.  Such advances were conditioned on repayment if it was ultimately determined that the person on whose behalf the advance was made did not meet the statutory standards of conduct required for indemnification.  Under Delaware law, such person may only be indemnified to the extent that they are determined to have acted in good faith and in a manner reasonably believed by them to be in the best interest of the Company. In connection with the Commission's investigation, the Company's Board of Directors engaged counsel to conduct an internal investigation of the matters underlying the Commission's investigation.  Based upon such report on the matters raised by the Commission's investigation, the Board of Director's has discovered no evidence that the referenced officers, directors, employees and agents acted other than in good faith and in a manner which they reasonably believed to have been in the best interests of the Company in discharging their duties. Accordingly, the Board of Directors has determined that the referenced individuals are entitled to indemnification for costs and expenses incurred in connection with the Commission investigation referenced above.

PROPOSAL 2

RELATIONSHIP WITH INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

The Company has selected the firm of Pender Newkirk & Company to serve as the independent certified public accountants for the Company for the current fiscal year ending March 31, 2000.  That firm has served as the auditors for the Company since 1993.  The persons named in the enclosed form of proxy have advised the Board of Directors that it is their intention, unless otherwise instructed by the shareholders, to vote for the selection of Pender Newkirk & Company as such independent auditors.  Representatives of Pender Newkirk & Company are not expected to be present at the annual meeting of shareholders.

REQUIRED VOTE

The affirmative vote of the holders of a majority of the shares of common stock represented in person or by proxy at the Annual Meeting is required to (i) elect the director, and (ii) ratify the selection of Pender Newkirk & Company as the Company's independent auditors for the year ended March 31, 2000.  Abstentions and broker non-votes will not be counted and have no effect.

The Board of Directors recommends that stockholders execute their proxies FOR the adoption of both proposed Items 1 and 2.

## ANNUAL REPORT

A copy of the Company's annual report for the fiscal year ended March 31, 1999 accompanies this proxy statement. Additional copies may be obtained by writing to Timothy R. Barnes, Vice President and Chief Financial Officer, at 100 North Tampa Street, Suite 3575, Tampa, Florida 33602.

## OTHER MATTERS

Other than proposed Items 1 and 2, the Board of Directors does not know of any other matters to come before the meeting; however, if any other matters properly come before the meeting, it is the intention of the persons designated as proxies to vote in accordance with their best judgment on such matters. If any other matter should properly come before the meeting, action on such matter will be approved if the number of votes cast in favor of the matter exceeds the number opposed.

## STOCKHOLDER PROPOSALS

The deadline for submission of shareholder proposals pursuant to Rule 14a-8 under the Securities Exchange Act of 1934, as amended ("Rule 14a-8"), for inclusion in the Company's proxy statement for its 2000 annual meeting is February 29, 2000. In addition, notice to the Company of a shareholder proposal submitted other than pursuant to Rule 14a-8 will be considered untimely and the persons named in proxies solicited by the Board of Directors of the Company for its 2000 annual meeting may exercise discretionary voting power with respect to any such proposal that the Company receives after April 29, 2000. Proposals must also comply with the Company's Bylaws and the proxy rules relating to shareholder proposals in order to be included in the Company's proxy materials.

## EXPENSES OF SOLICITATION

The cost of soliciting proxies will be borne by the Company. The Company will reimburse brokers, banks and other persons holding stock in their names, or in the names of nominees, for their expenses in sending these proxy materials to beneficial owners. Proxies may be solicited by present or former directors, officers and other employees of the Company, who will receive no additional compensation therefor, through the mail and through telephone, fax, e-mail or telegraphic communications to, or by meetings with, stockholders or their representatives.

June 28, 1999

STOCKHOLDERS ARE URGED TO SPECIFY THEIR CHOICES, DATE, SIGN AND RETURN THE ENCLOSED FORM OF PROXY IN THE ENCLOSED ENVELOPE, POSTAGE FOR WHICH HAS BEEN PROVIDED. YOUR PROMPT RESPONSE WILL BE APPRECIATED.

EXCAL ENTERPRISES, INC.

PROXY SOLICITED ON BEHALF OF BOARD OF DIRECTORS

The undersigned, having received the Proxy Statement for the Company's 1999 annual meeting relating to the proposals listed below, appoints W. Carey Webb and Timothy R. Barnes, and each or either of them, as proxies, with full power of substitution and resubstitution, to vote all shares of Common Stock of Excal Enterprises, Inc. which the undersigned is entitled to vote, in the manner specified.

THIS PROXY WILL BE VOTED AS DIRECTED, OR IF NO DIRECTION IS INDICATED, WILL BE VOTED "FOR" EACH OF THE PROPOSALS.

Proposal 1:     Election of Directors

John L. Caskey for a term expiring at the 2002 annual meeting of stockholders.

|__| FOR     |__| WITHHOLD

Proposal 2: Relationship with Independent Certified Public Accountant

Pender Newkirk & Company to serve as the independent certified public accountants for the Company for the current fiscal year ended March 31, 2000.

|__| FOR     |__| AGAINST     |__| ABSTAIN

Should any other matters requiring a vote of the shareholders arise, the above-named proxies are authorized to vote the same in accordance with their best judgment in the interest of the Company. The Board of Directors is not aware of any matter that is to be presented for action at the meeting other than the matters set forth herein.

Dated:                     , 1999

(SEAL)

(SEAL)

(Please sign exactly as name

or names appear hereon. Executors, administrators, trustees or other representatives should so indicate when signing.)

```
</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 K0vNbPdw/6PIbbDJwwWibcjViVzE/slJ3LLAbDubzdE+DwalWBSr+SXMVvPXQ1zH
 yb+OPhGmf59QxdKM0sR79A==

<SEC-DOCUMENT>0000832813-99-000009.txt : 19990720
<SEC-HEADER>0000832813-99-000009.hdr.sgml : 19990720
ACCESSION NUMBER:               0000832813-99-000009
CONFORMED SUBMISSION TYPE:      DEFA14A
PUBLIC DOCUMENT COUNT:          1
FILED AS OF DATE:               19990719

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:          EXCAL ENTERPRISES INC
                CENTRAL INDEX KEY:               0000832813
                STANDARD INDUSTRIAL CLASSIFICATION: SPECIAL INDUSTRY MACHINERY
                IRS NUMBER:                      592855398
                STATE OF INCORPORATION:          DE
                FISCAL YEAR END:                 0331

        FILING VALUES:
                FORM TYPE:          DEFA14A
                SEC ACT:
                SEC FILE NUMBER:    000-17069
                FILM NUMBER:        99666435

        BUSINESS ADDRESS:
                STREET 1:           100 N TAMPA ST
                STREET 2:           STE 3575
                CITY:               TAMPA
                STATE:              FL
                ZIP:                33602
                BUSINESS PHONE:     8132240228

        MAIL ADDRESS:
                STREET 1:           100 NORTH TAMPA ST SUITE 3575
                STREET 2:           100 NORTH TAMPA ST SUITE 3575
                CITY:               TAMPA
                STATE:              FL
                ZIP:                33602

        FORMER COMPANY:
                FORMER CONFORMED NAME: ASSIX INTERNATIONAL INC
                DATE OF NAME CHANGE:   19920703
</SEC-HEADER>
<DOCUMENT>
<TYPE>DEFA14A
<SEQUENCE>1
<TEXT>
```



EXHIBIT

B

SCHEDULE 14A INFORMATION
Proxy Statement Pursuant to Section 14(a) of the Securities Exchange

```
                         Act of 1934
                    (Amendment No. ____)

Filed by the Registrant [X]
Filed by a Party other than the Registrant [  ]

Check the appropriate box:

[  ] Preliminary Proxy Statement
[  ] Confidential, for Use of the Commission Only (as permitted by
     Rule 14a-6(e)(2))
[  ] Definitive Proxy Statement
[X] Definitive Additional Materials
[  ] Soliciting Material Pursuant to ' 240.14a-11(c) or ' 240.14a-12

                    Excal Enterprises, Inc.
         ---------------------------------------------------
              (Name of Registrant as Specified in its Charter)


                    -----------------------------
- --------------------------------------------------------------------
                    --------------------
              (Name of Person(s) Filing Proxy Statement if other than the
                         Registrant)

Payment of Filing Fee (Check the appropriate box):

[X]  No fee required.

[  ] Fee  computed on table below per Exchange Act Rules  14a-6(i)(4)
     and 0-11.

     1)Title  of  each  class  of  securities  to  which  transaction
       applies:

     2)Aggregate number of securities to which transaction applies:

     3)Per  unit  price  or  other underlying  value  of  transaction
       computed  pursuant to Exchange Act Rule 0-11 (Set  forth  the
       amount on which  the filing fee is calculated and state how  it
       was determined):

     4)Proposed maximum aggregate value of transaction:

     5)Total fee paid:

[  ] Fee paid previously with preliminary materials.

[  ] Check  box  if  any  part of the fee is offset  as  provided  by
     Exchange  Act Rule 0-11(a)(2) and identify the filing for  which
     the  offsetting fee was paid previously.  Identify the  previous
     filing by registration statement number, or the Form or Schedule
     and the date of its filing.

     1)Amount Previously Paid:

     2)Form, Schedule or Registration Statement No.:

     3)Filing Party:
```

4)Date Filed:

EXCAL ENTERPRISES, INC.

100 North Tampa Street, Suite 3575
Tampa, Florida 33602

SUPPLEMENT DATED JULY 20, 1999
TO PROXY STATEMENT FOR 1999 ANNUAL MEETING OF SHAREHOLDERS

This supplement and the enclosed form of proxy are being sent to
shareholders of Excal Enterprises, Inc. (the "Company") on or about
July 20, 1999 in connection with the solicitation of proxies by
the Company's Board of Directors relating to the addition to the
agenda for the 1999 Annual Meeting of Shareholders of a shareholder
proposal submitted by EP Opportunity Fund, L.L.C. ("EP") to amend the
Company's bylaws. EP's proposal, which is set forth below, seeks to
amend the Company's bylaws to require (1) that action by the Board of
Directors be taken by the unanimous vote of all directors and (2)
that a 75% vote of the outstanding Common Stock be required to amend
this provision. THE BOARD OF DIRECTORS BELIEVES THAT THIS PROVISION
WOULD LEAD TO DEADLOCK SITUATIONS AND THEREFORE IS NOT IN THE BEST
INTERESTS OF THE COMPANY OR ITS SHAREHOLDERS. ACCORDINGLY, THE BOARD
RECOMMENDS THAT SHAREHOLDERS VOTE AGAINST THE PROPOSAL.

AGENDA

The revised agenda for the meeting is set forth below. The
meeting will be held as originally scheduled on Thursday, August 5,
1999, at 1:30 p.m., local time, at the University Club, located on
the 38th floor of One Tampa City Center, Tampa Florida.

The meeting will be held for the following purposes:

1.   To elect one Class I director to serve for a three-year term
     expiring at the annual meeting of shareholders to be held in 2002 and
     until his successor is elected and qualified.

2.   To ratify the selection of Pender Newkirk and Company as
     independent auditors for the current fiscal year ending March 31,
     2000.

3.   To consider and vote on EP's shareholder proposal to amend the
     Company's bylaws to require that action by the Board of Directors be
     taken by the unanimous vote of all directors and that a 75% vote of
     the outstanding Common Stock be required to amend this provision.

4.   To transact such other business as may properly come before the
     meeting or any adjournments thereof.

Proxies solicited by the Board of Directors will be voted "For"
Proposals 1 and 2 and "against" Proposal 3 unless shareholders
specify a contrary choice. Any shareholder giving a proxy may revoke
it at any time by (1) giving written notice to the Secretary of the
Company, (2) submitting a later dated proxy with a different vote, or

(3) attending the meeting and voting in person. The shares represented by the proxyies will be voted unless the proxy is mutilated or otherwise received in such form or at such time as to render it not votable.

Proposal 3 is set forth below. Please see the Company's Proxy Statement dated June 28, 1999 and accompanying the proxy card that accompanied it for information regarding the other proposals. The enclosed form of proxy relates only to Proposal 3. You should use the original proxy card to vote on Proposals 1 and 2.

PROPOSAL 3

SHAREHOLDER PROPOSAL TO AMEND BYLAWS TO REQUIRE THAT
BOARD ACTION BY BE UNANIMOUS VOTE OF ALL DIRECTORS

EP Opportunity Fund, L.L.C. ("EP"), 77 West Wacker Drive, 46th Floor, Chicago, Illinois 60601-1635, has submitted Proposal 3 and the supporting statement set forth below. In accordance with regulations of the Securities and Exchange Commission, the proposed resolution and supporting statement, for which the Board of Directors and the Company accept no responsibility, are set forth below. EP is the record owner of 100 shares and beneficial owner of a total of 600,000 shares of Common Stock of the Company.

Shareholder Proposal

"RESOLVED, that Section 5.06 of the Company's Second Amended and Restated Bylaws shall be deleted in its entirety and shall be replaced with the following: `Section 5.06 Vote Required for Action. Except as otherwise provided by law, all action to be taken by the Board of Directors shall be taken by the unanimous vote of all of the directors then holding office. Notwithstanding any other provisions of these by-laws to the contrary, the affirmative vote of at least 75% of the shares entitled to vote at a meeting of stockholders shall be required to alter, amend or repeal this Section 5.06.'"

Proponent's EP's Statement in Support of its Proposal

"We are the largest independent stockholder of the Company and believe the Company's shares are significantly undervalued. We believe the best way to maximize stockholder value is to sell the Company to, or merge with, an unaffiliated third party. Although we have repeatedly urged the Company's management to undertake such a transaction, we do not believe that any such transaction will be forthcoming.

During a time of record stock market returns and profitability, the Company's stock has languished and its operating results have been disappointing. Rather than searching for ways to maximize stockholder value, the Company's management has embarked on a misguided expansion plan. The Company's first acquisition lost money in its first quarter under the Company's ownership. We do not believe that expansion will maximize stockholder value.

Moreover, we believe the continuing litigation alleging violations of Federal securities disclosure and insider trading laws against the Company and certain past and present officers and directors has been a significant drain of the Company's resources. During the last two and a half years, the Company has spent over $2,500,000 on litigation costs and settlements.1 We believe this hemorrhaging should stop and the responsible parties, not the Company, should be required to bear these costs.

We further believe that the Company's management has been engaged in a scheme to disenfranchise stockholders. A number of important provisions of the Company's by-laws regarding corporate governance and the ability to remove directors appear to prohibit amendment without the consent of 75% of the Company's stockholders. However, management has indicated it has issued itself sufficient shares to block any such supermajority. Thus, even if all of the Company's independent stockholders consented to amending these provisions or to removing the Company's directors, the Company's management purportedly has sufficient shares, much of it recently issued, to thwart the will of the stockholders.

In order to remedy this situation, we have nominated Jeffrey Eisenberg, the principal of our manager, as a director of the Company. If Mr. Eisenberg is elected, he would be only one of three directors. By proposing that all board action require unanimity, we are trying to empower Mr. Eisenberg to prevent management's misguided expansions plans and to enable him to effectively negotiate with the Company's management and remaining directors to seek to maximize stockholder value through a sale or merger of the Company."

Board of Directors' Recommendation: The Board of Directors Unanimously Recommends that Shareholders Vote AGAINST Proposal 3

The Board of Directors believes that requiring board action by unanimous vote of all directors is extremely unwise because it is likely to lead to deadlock. For example, if board action, including action in response to an unanticipated emergency, is required at a time when a director is sick or otherwise not available, the board would not be able to take action if EP's proposed bylaw amendment is adopted.

Similarly, the Board believes that a unanimity requirement will prevent a majority of the directors from taking action they believe to be in the best interests of the Company if such action is opposed by a single director. The proposal would give a single director veto power over all actions by the Board.

The Board believes that it is not in the Company's interests for the Board to face the possibility of such a deadlock situation. Failure to obtain the unanimous vote of all directors would make it impossible for the Company to take action that requires board oversight or approval.

EP's supporting statement clearly indicates disagreements with

the current Board of Directors' business plan for maximizing shareholder value. Over the past several years, there have been several minority shareholder groups that have recommended that the Company sell the property in Jacksonville, Florida (the "Imeson Center") and liquidate the Company. The Company's management has not followed these recommendations because it believeds it could can increase the value of the Imeson Center. In fact, the Company has increased the amount of space leased, length of the leases and lease rates per square foot, . Tthereforeby, increasing the value of the Imeson Center. Had the Company followed the recommendations of these minority shareholders, the Imeson Center property would have been sold at a much lower value than it is worth today. Management believes that it can continue to increase the value of Imeson Center and that a sale at this time would be premature and result in a loss of potential value for our shareholders.

The Company's current management has repeatedly stated that its plan was is to maximize the value of the Imeson Center and expand the Company's operations into new areas. The acquisition of Roxbury was completed in December 1998. The Company's annual financial statements only included four months of operations for Roxbury. Roxbury has been an extremely seasonal business. The four months included in the annual financial statements represent the four slowest months for Roxbury. This fact combined with the expenditures on new marketing programs to increase future revenues resulted in the loss, which management fully anticipated. Management expects that the annual results of operations for fiscal 2000 will be profitable even though the current objective is revenue growth.

Despite the implication in the wording of EP's statement of support, the current officers of the Company are not now and have not been defendants in any litigation involving the Company. The Company has been a defendant in several lawsuits, most of which related to activities occurring prior to 1995. Current management has worked diligently to eliminate the outstanding litigation in a way that would maximize asset preservation for the Company. The vast majority of the costs incurred over the last three fiscal years have related to the lawsuits the Company has successfully defended or settled. There is currently only one lawsuit outstanding. We hope to have this one remaining lawsuit with the SEC finalized by year end. In compliance with the Company's Certificate of Incorporation, Delaware state law, and other contractual obligations, the Company is required to indemnify its officers and directors, and nothing in the proposals made by EP would change that fact. We will continue to attempt to bring to a conclusion the last remaining lawsuit while maximizing the preservation of Company assets.

The by-law provisions that EP complains about in its supporting statement were approved by an overwhelming majority of the Company's shareholders in 1996 in response to attempts by minority shareholders to gain control of the Company.

In short, tThe Board does not believe that a minority of directors should have the ability, through a unanimous vote requirement, to veto the business decisions made by a majority of the directors.

Adoption of EP's proposed bylaw amendment requires the affirmative vote of a majority of the shares entitled to vote at the annual meeting. For this purpose, broker non-votes will not be

counted, and abstentions will have the effect of a vote against the proposal.

THE BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS A VOTE AGAINST PROPOSAL 3.


Other

As noted in EP's supporting statement, EP has attempted to nominate a representative to stand for election as a director. The Board of Directors has voted not to accept EP's nominee as part of the slate for which the Board is soliciting proxies. Under regulations of the Securities and Exchange Commission, the Company is not required to include information concerning other prospective nominees in its proxy materials.

Expenses of Solicitation

The cost of soliciting proxies will be borne by the Company. The Company will reimburse brokers, banks and other persons holding stock in their names, or in the names of nominees, for their expenses in sending proxy materials to beneficial owners. Proxies may be solicited by present or former directors, officers and other employees of the Company, who will receive no additional compensation therefor, through the mail and through telephone, fax, e-mail or telegraphic communications to, or by meetings with, stockholders or their representatives. In addition, the Company has retained D. F. King & Co., Inc. to solicit proxies on behalf of the Board of Directors. The Company will pay such firm $4.00 per completed call in exchange for its services.


EXCAL ENTERPRISES, INC.

PROXY SOLICITED ON BEHALF OF BOARD OF DIRECTORS

The undersigned, having received the Supplement to Proxy Statement for the Company's 1999 annual meeting relating to the proposal listed below, appoints W. Carey Webb and Timothy R. Barnes, and each or either of them, as proxies, with full power of substitution and resubstitution, to vote all shares of Common Stock of Excal Enterprises, Inc. which the undersigned is entitled to vote, in the manner specified.

THIS PROXY WILL BE VOTED AS DIRECTED, OR IF NO DIRECTION IS INDICATED, WILL BE VOTED "AGAINST" PROPOSAL 3.

Proposal 3:  Amendment to Bylaws

Amend the Company's bylaws to require that action by the Board of Directors be taken by the unanimous vote of all directors and that a 75% vote of the Common Stock be required to amend this provision.

    [ ] FOR              [ ] AGAINST           [ ] ABSTAIN


This proxy relates only to Proposal 3, which has been added to the annual meeting agenda after the mailing of the Board of Directors'

form of proxy cards for Proposals 1 and 2.

Dated:_____, 1999


_____(SEAL)


_____(SEAL)
(Please sign exactly as name or
names appear hereon.  Executors,
administrators, trustees or other
representatives should so indicate
when signing.)


_____

    1 The Board of Directors notes that the amount actually spent
was $2,250,135 (as opposed to $2,500,000) over three fiscal years (as
opposed to two and a half years).

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 IpE9on+14RfG1gvQtOjyHHZcxVEXwBq34Al2Twh/dBDUIltwoDY9sDwExxUQTppj
 aF3aqTv+cTuQmloBZuHLuQ==

<SEC-DOCUMENT>0000902561-99-000315.txt : 19990728
<SEC-HEADER>0000902561-99-000315.hdr.sgml : 19990728
ACCESSION NUMBER:          0000902561-99-000315
CONFORMED SUBMISSION TYPE:  DEFC14A
PUBLIC DOCUMENT COUNT:      1
FILED AS OF DATE:          19990727

SUBJECT COMPANY:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           EXCAL ENTERPRISES INC
                CENTRAL INDEX KEY:                0000832813
                STANDARD INDUSTRIAL CLASSIFICATION:  SPECIAL INDUSTRY MACHINERY
                IRS NUMBER:                       592855398
                STATE OF INCORPORATION:           DE
                FISCAL YEAR END:                  0331

        FILING VALUES:
                FORM TYPE:        DEFC14A
                SEC ACT:
                SEC FILE NUMBER:  000-17069
                FILM NUMBER:      99670969

        BUSINESS ADDRESS:
                STREET 1:         100 N TAMPA ST
                STREET 2:         STE 3575
                CITY:             TAMPA
                STATE:            FL
                ZIP:              33602
                BUSINESS PHONE:   8132240228

        MAIL ADDRESS:
                STREET 1:         100 NORTH TAMPA ST SUITE 3575
                STREET 2:         100 NORTH TAMPA ST SUITE 3575
                CITY:             TAMPA
                STATE:            FL
                ZIP:              33602

        FORMER COMPANY:
                FORMER CONFORMED NAME:  ASSIX INTERNATIONAL INC
                DATE OF NAME CHANGE:    19920703

FILED BY:

        COMPANY DATA:
                COMPANY CONFORMED NAME:           EP OPPORTUNITY FUND LLC
                CENTRAL INDEX KEY:                0001053146
                STANDARD INDUSTRIAL CLASSIFICATION:  []
```

EXHIBIT

C

```
FILING VALUES:
        FORM TYPE:              DEFC14A

BUSINESS ADDRESS:
        STREET 1:               33 WEST MONROE ST.
        CITY:                   CHICAGO
        STATE:                  IL
        ZIP:                    60603
</SEC-HEADER>
<DOCUMENT>
<TYPE>DEFC14A
<SEQUENCE>1
<TEXT>
```

                    SCHEDULE 14A INFORMATION
        Proxy Statement Pursuant to Section 14(a) of the
                Securities Exchange Act of 1934
                    (Amendment No. ____)

                Filed by the Registrant [ ]
        Filed by a Party other than the Registrant [X]

Check the appropriate box:
[ ]   Preliminary Proxy Statement
[ ]   Confidential, for Use of the Commission Only
[X]   Definitive Proxy Statement
[ ]   Definitive Additional Materials
[ ]   Soliciting Material Pursuant to  240.14a-11(c) or  240.14a-12

                    Excal Enterprises, Inc.
        -----------------------------------------------
        (Name of Registrant as Specified in its Charter)


                    EP Opportunity Fund, L.L.C.
    ---------------------------------------------------------------------
    (Name of Person(s) Filing Proxy Statement, if other than the Registrant)


Payment of Filing Fee (Check the appropriate box):

[X]   No fee required.

[ ]   Fee computed on table below per Exchange Act Rules 14a-6(i)(4) and 0-11.

        1)   Title of each class of securities to which transaction applies:

        2)   Aggregate number of securities to which transaction applies:

        3)   Per unit price or other underlying value of transaction computed
             pursuant to Exchange Act Rule 0-11 (Set forth the amount on which
             the filing fee is calculated and state how it was determined):

        4)   Proposed maximum aggregate value of transaction:

        5)   Total fee paid:

[ ]   Fee paid previously with preliminary materials.

[ ]   Check box if any part of the fee is offset as provided by

Exchange Act Rule 0-11(a)(2) and identify the filing for which the
offsetting fee was paid previously. Identify the previous filing
by registration statement number, or the Form or Schedule and the
date of its filing.

1)    Amount Previously Paid:

2)    Form, Schedule or Registration Statement No.:

3)    Filing Party:

4)    Date Filed:

<PAGE>


PROXY STATEMENT
of
EP OPPORTUNITY FUND, L.L.C.


IN OPPOSITION TO THE BOARD OF DIRECTORS OF EXCAL ENTERPRISES, INC.
for use at the
ANNUAL MEETING OF STOCKHOLDERS OF EXCAL ENTERPRISES, INC.
to be held
AUGUST 5, 1999


INTRODUCTION

        This Proxy Statement, which is first being sent to holders of the
common stock, par value $0.001 per share (the "Common Stock") of Excal
Enterprises, Inc., a Delaware corporation (the "Company"), on or about July
27, 1999 is furnished by EP Opportunity Fund, L.L.C. (the "Fund"),
Eisenberg Partners, L.L.C. ("Eisenberg Partners"), the Manager of the Fund,
and Jeffrey Eisenberg, the Manager of Eisenberg Partners, in connection
with the Fund's solicitation of proxies for use at the Company's 1999
Annual Meeting of Stockholders, to be held at the University Club, located
on the 38th floor of One Tampa Center, Tampa Florida, on August 5, 1999 at
1:30 p.m. (the "Annual Meeting"), or any adjournments or postponements of
such meeting. Stockholders of record at the close of business on June 22,
1999 (the "Record Date"), are entitled to notice of and to vote at the
Annual Meeting. According to the Company, 4,256,240 shares of Common Stock
were outstanding on the Record Date. As of the Record Date, the Fund,
Eisenberg Partners and Jeffrey Eisenberg beneficially owned an aggregate of
600,000 shares of Common Stock. The address of the Company is 100 North
Tampa Street, Suite 3575, Tampa, Florida 33602.

        The Fund is soliciting proxies for the following matters, which
are more fully described in this Proxy Statement:

1.        To elect Jeffrey Eisenberg to the Company's Board of Directors to
          serve as the Class I director;

2.        To adopt a proposal amending the Company's Second Amended and
          Restated Bylaws to provide that all action to be taken by the
          Board of Directors shall be taken by the unanimous vote of all of
          the directors then holding office and requiring the affirmative
          vote of at least 75% of the shares entitled to vote at a meeting

of stockholders to amend the provision.

        The Fund urges you to vote FOR the election of its nominee as
director and FOR the ratification of the other proposal described in this
Proxy Statement by signing the enclosed BLUE proxy form as soon as
possible. IF YOU HAVE ALREADY SENT A PROXY TO MANAGEMENT OF THE COMPANY,
YOU CAN REVOKE THAT PROXY BY MERELY MARKING, SIGNING, DATING AND MAILING
THE ENCLOSED BLUE PROXY FORM OR BY VOTING IN PERSON AT THE ANNUAL MEETING.

                                                                    1

<PAGE>


                    VOTING TO SUPPORT THE FUND'S INITIATIVES

        If you wish to support the Fund's nominee and the other proposal
described in this Proxy Statement, please vote on the BLUE proxy form.
Please note that management has circulated supplemental proxy materials and
proxy cards with respect to the proposal. If you wish to vote in favor of
the proposal, you may do so with the supplemental proxy card. However, you
may only vote for the Fund's nominee on the BLUE proxy form. If you later
vote on management's proxy form - even if it is to withhold authority to
vote for management's nominee - you will revoke your previous vote for the
Fund's nominee.

        Although you may vote more than once, only one proxy with respect
to each matter will be counted at the Annual Meeting, and that will be your
latest dated, validly executed proxy. Any stockholder giving a proxy may
revoke the same at any time by (i) giving written notice of revocation to
the Secretary of the Company, (ii) by submitting a later dated proxy with a
different vote; or (iii) by attending the meeting and voting in person.

        Because only a stockholder's latest dated proxy will count with
respect to any matter voted upon, a stockholder choosing to vote for the
Fund's nominee on the BLUE proxy form is giving up the right to choose the
director nominated by the Board of Directors. Moreover, a stockholder
CANNOT use the proxy card supplied by management to vote for the election
of Mr. Eisenberg. Execution of the BLUE proxy form will not affect your
right to attend the Annual Meeting and vote in person. The Company's
Amended and Restated Certificate of Incorporation (the "Certificate of
Incorporation") and Second Amendment and Restated Bylaws (the "Bylaws") do
not require stockholders who have voted by proxy to notify the Company's
secretary of their attendance at the Annual Meeting and intention to vote
at the Annual Meeting in order to revoke such proxy.

        Shares of Common Stock represented by properly executed BLUE
proxies will be voted as directed, or if no specific direction is
indicated, will be voted FOR the Fund's nominee and FOR ratification of the
Fund's proposal. Such proxies will also be voted in the discretion of the
proxy holders with regard to any other matter which may be brought to a
vote at the Annual Meeting. Proxies solicited hereby may be exercised only
at the Annual Meeting and any adjournments or postponements thereof and
will not be used for any other meeting.


                            YOUR VOTE IS IMPORTANT

        No matter how many or how few shares you own, we urge you to

promptly sign, date and mail (or fax both sides of) the enclosed BLUE proxy card to vote for the proposals.

Voting "Street Name" Shares: If you hold your shares in the name of one or more brokerage firms, banks or nominees, only they can exercise voting rights with respect to your shares and only upon receipt of your specific instructions. So it is critical that you promptly sign, date and mail the enclosed BLUE proxy card in the envelope provided or contact the

2

<PAGE>

person responsible for your account and give instructions to sign, date and mail the BLUE proxy card representing your shares. The Fund urges you to confirm in writing your instructions to the person responsible for your account and to provide a copy of those instructions to the in care of Beacon Hill Partners, Inc., who is assisting in this solicitation, at the address and telephone numbers set forth below and on the back cover of this Proxy Statement, so that the Fund will be aware of all instructions and can attempt to ensure that such instructions are followed.

The Fund is not aware of any proposals other than the proposals contained in the Company's proxy materials to be brought before the Annual Meeting. However, should other proposals be brought before the Annual Meeting, the persons named as proxies on the enclosed BLUE proxy card will vote on such matters in their discretion.

If you have any questions regarding your proxy, or need assistance in voting your shares, please call:

BEACON HILL PARTNERS, INC.
90 BROAD STREET, 20TH FLOOR
NEW YORK, NEW YORK 10004
(212) 843-8500 (CALL COLLECT) OR
CALL TOLL-FREE (800) 475-9320
FAX (212) 843-4384

BACKGROUND AND REASONS FOR THE FUND'S SOLICITATION

Business Operations of the Company

Until 1994, the Company's principal line of business had been in the automotive services industry. In 1994, the Company acquired certain real estate located in Jacksonville, Florida known as the "Imeson Center" as part of a settlement with Sears Roebuck & Co. for certain claims by the Company in connection with the termination by Sears of an agreement between Sears and the Company. The property includes a two-story building consisting of approximately 1,666,000 square feet of leaseable office and warehouse space, and several outparcels of vacant land. Since 1997, the Company's primary business activity has consisted of serving as landlord with respect to the Imeson Center. As of March 31, 1999, all but 41,000 square feet of the Imeson Center was leased.

The Securities and Exchange Commission (the "SEC") has filed suit against the Company alleging, among other things, that the Company has materially understated the value of the Imeson Center. The Company has

disclosed that it is aware that other parties have subsequently prepared appraisals and valuations of the Imeson Center in connection with various litigation and that "some of these appraisals and valuations have placed the value of this property substantially higher than the Company's original valuation."

3

<PAGE>

In September 1997, the Company mortgaged the Imeson Center as security for a five year, $13,500,000 loan bearing interest at the rate of 9% per annum. The Company stated in its Annual Report on Form 10-K for the nine months ended March 31, 1999 (the "Form 10-K") that it plans to use the proceeds from leveraging the Imeson Center to acquire additional new core businesses, among other things. The Company's stated objective is to identify and acquire a company that will be used as a springboard to future growth. The Company stated in the Form 10-K that management believes this will be best accomplished by acquiring a company that is a leader in a niche segment of a large market or in an industry that will lend itself to a consolidation strategy.

In December 1998, the Company acquired for $1.5 million Roxbury Industries Corp ("Roxbury"), which produces and distributes knit products licensed by professional and major college sports teams. The former common stockholders of Roxbury exchanged their common stock for 1,040,816 shares of Roxbury convertible preferred stock, par value $0.001. The preferred stock does not contain preferential rights to distributions, does not have voting rights and is convertible into Roxbury common stock beginning on July 15, 2002. The number of shares that the preferred stock will convert into varies based on the performance of Roxbury. Since December 1998, the Company's sports licensing segment, consisting solely of Roxbury, has lost over $500,000 (before taxes), almost one-quarter of its total investment.

The information contained in the preceding four paragraphs has been obtained from the Form 10-K.

During September 1997, the Fund purchased nearly 200,000 shares of the Company's Common Stock at an average price of approximately $5.50 per share. The Fund believed, based upon its assessment of the fair market value of the Imeson Center and the experience of its manager in valuing companies, that the Company's Common Stock was undervalued and that the Company could increase stockholder value by selling or liquidating the Company. On numerous occasions since September 1997, the Fund has urged the Company to consider liquidating or selling.

The Fund believes that the Company's expansion plan is misguided. Furthermore, the Fund does not believe that the Company's management has demonstrated any competence to carry out such an expansion plan. As stated in the Form 10-K, the Company is seeking to become a leader in a niche segment of an unspecified large market or in an unspecified industry that will lend itself to a consolidation strategy. The Company's management has not demonstrated experience in mergers and acquisitions or in consolidating industries. Furthermore, management has not limited itself to industries in which it has demonstrated experience and may very well acquire businesses in which management has no prior experience. The Fund believes that the poor performance of the Company's newly acquired sports licensing segment

is indicative of the risks inherent in acquiring new businesses. The Fund
believes, based upon the business experience of its Manager, that the
stockholders of the Company would realize significantly greater value from
receiving the cash proceeds from a sale or liquidation of the Company than
if the Company were to invest its assets in new lines of business.

4

<PAGE>

Furthermore, the Fund believes that a thorough and proper independent
appraisal of the property should be made and that the Company should be
sold or liquidated. The Fund has not obtained reports from independent
consultants as to whether the Fund's proposal or similar proposals will
enhance stockholder value. There can be no assurance that if the Fund's
nominee is elected and the Fund's proposal is adopted that the Company's
performance will improve or that stockholder value will be maximized or
enhanced.

        The Fund also particularly notes the significant drain on the
Company's financial and other resources arising out of litigation brought
against the Company and certain of its current and former officer and/or
directors. As noted in the Form 10-K, the SEC has filed suit in the Federal
District Court for the Middle District of Florida against the Company, R.
Park Newton, III (a director of the Company and the former President and
Chief Executive Officer), and others alleging that the Company and in
various instances the named individuals: (i) during the fiscal years 1991
through 1993 concealed the loss of the Company's principal customers as
licensed dealers and filed false periodic reports under the Securities
Exchange Act of 1934, as amended, with respect thereto; (ii) falsified the
Company's books and records in order to conceal the loss of its principal
customers, including using allegedly fictitious invoices to deceive the
Company's auditors; and, (iii) understated the value of commercial real
estate received by the Company in a contractual settlement with Sears in
order to reduce the Company's income tax liability. As a result of this and
other litigation, the Company has spent over $1 million during the last two
years on litigation related expenses. The Fund believes that these matters
should be quickly settled, the persons responsible for the violations of
law should bear the responsibility for their actions and that the Company
should be run for the benefit of its stockholders, not its lawyers.

Communications with the Company

        As a result of the Fund's analysis of the Company's operations and
stock price, in November, 1997, the Fund met with the Company's management
at the Company's Jacksonville, Florida property to discuss the Company's
current and future operations. After remaining unsatisfied with the
Company' financial prospects and intended plans, in September 1998, the
Fund sent a letter to the Company notifying it of the Fund's intention to
nominate Mr. Eisenberg for election as a Class III director and to bring
certain proposals to a vote at the 1998 Annual Meeting. The Fund also
provided the Company with the appropriate information required under its
Bylaws for stockholders to bring director nominations and proposals at the
Annual Meeting. Because of certain technical matters, the Fund's nomination
and proposal were not brought before stockholders at the November 1998
meeting.

        In early 1999, the Company indicated in a Current Report on Form

8-K filed with the SEC its intention to change its fiscal year end to March
31, 1999 but failed to give notice of the date of the new stockholders
meeting. In June 1999, in compliance with the timing disclosed in the
Company's 1998 proxy statement, the Fund sent a letter to the Company
notifying it of the Fund's intention to nominate Mr. Eisenberg for election
as a Class I director and to bring a proposal to a vote at the 1999 Annual
Meeting. The Company had attempted to keep the Fund's proposal from being
voted upon by stockholders by claiming that the Fund's notice wasn't timely

                                                                        5

<PAGE>

and sought the concurrence of the SEC that the Fund's proposal could be
kept out of the Company's proxy materials . However, the SEC declined to
concur with the Company's position and on or about July 20, 1999, the
Company mailed a supplement to its own proxy materials containing the
Fund's proposal.

Board Nomination

        The Fund, which beneficially owns approximately 14.1% of the
issued and outstanding shares of Common Stock as of the record date,
believes that it is in the best interests of the stockholders of the
Company that directors be elected to the Company's Board of Directors who
are in favor of taking steps intended to result in the maximization of the
stockholders' investment in the Company, which could include (among other
actions) the solicitation, review and negotiation of offers to merge or
acquire the Company on terms that are fair and in the best interests of all
stockholders of the Company. The Fund believes that the election of Mr.
Eisenberg will be in the best interests of stockholders of the Company
because Mr. Eisenberg will attempt to focus the attention of the Board of
Directors on actions that will lead to maximizing the value of the Common
Stock of the Company. The Fund has not obtained reports from independent
consultants as to whether the Fund's proposal or similar proposals will
enhance stockholder value. There can be no assurance that if the Fund's
nominee is elected that the Company's performance will improve or that
stockholder value will be maximized or enhanced.

        Mr. Eisenberg, who is the Manager of Eisenberg Partners, L.L.C.,
the Manager of the Fund, is an attorney and investment manager who is
highly experienced in the areas of financial and investment analysis, as
well as the negotiation and consummation of mergers, acquisitions and other
change of control transactions. See "Information Concerning The Fund And
Its Nominee." The election of Mr. Eisenberg as a Class I director will
require the affirmative vote of a plurality of the shares of Common Stock
voting in the election at the Annual Meeting.

Proposal to Amend Bylaws

        If Mr. Eisenberg is elected, he will be only one of three
directors. The purpose of the Fund's proposal to amend the Company's Bylaws
to require a unanimous vote for all director action would empower Mr.
Eisenberg as a minority member of the Board of Directors. While Mr.
Eisenberg would not be able to take any affirmative action as a minority
director, he would be able to prevent the Board of Directors from taking
any further action that would negatively affect stockholders. The proposal
would also require the affirmative vote of at least 75% of the shares

entitled to vote at a meeting of stockholders to amend or repeal the
provision. In the event Mr. Eisenberg is elected but is unsuccessful over
the next year in persuading the Board of Directors to actively pursue his
intent to maximize stockholder value, the Fund would probably seek to elect
another director at the Company's 2000 Annual Meeting and repeal the Bylaw
change. Repeal of the Bylaw change could be difficult as it would require
the affirmative vote of at least 75% of the shares entitled to vote at a
meeting of stockholders. If successful in electing this second director in
2000 and repeal the Bylaw change, the Board of Directors of the Company
would be controlled by persons nominated by the Fund and who, the Fund

6

<PAGE>

believes, would seek to maximize stockholder value by seeking to effect a
sale or liquidation of the Company.

### ELECTION OF DIRECTOR

     The Company's Board of Directors currently consists of three
directors. The Board of Directors is divided into three equal classes
consisting of one director each. At each annual meeting of stockholders,
members of one of the classes, on a rotating basis, are elected for a
three-year term. One director is up for election at the 1999 Annual Meeting
as a Class I director. The individual elected at the 1999 Annual Meeting
will serve for the term expiring at the Annual Meeting of Stockholders in
2002.

     The nominee for Class I director receiving the highest number of
votes at the Annual Meeting will be elected to fill that position.
Abstentions and broker non-votes will be counted for purposes of
determining a quorum at the Annual Meeting. If a quorum is present at the
Annual Meeting, abstentions, broker non-votes and shares not represented at
the Annual Meeting in person or by proxy will have no effect on the
election.

     In the event Mr. Eisenberg is elected, the Fund will obtain
representation on the Company's Board of Directors. Stockholders may wish
to refer to the proxy statement of the Company, dated June 28, 1999 for
additional information regarding the background, qualifications and other
information concerning the Company's nominee and additional information
about the Company required to be included in the Company's proxy
solicitation materials under Section 14(a) of the Securities Exchange Act
of 1934, as amended, and the rules and regulations of the Securities and
Exchange Commission.

     If Mr. Eisenberg is elected and takes office as a director, he
intends to: (i) undertake his duties as a director of the Company in
compliance with all applicable legal requirements, including the general
fiduciary obligations imposed upon corporate directors, (ii) take action to
solicit, and cause the Board to review and negotiate, offers to merge or
acquire the Company on terms that are fair and in the best interests of all
stockholders of the Company and (iii) urge the Board to adopt any other
measures he deems advisable in light of the then current circumstances
aimed at enhancing the value of the Common Stock.

Since the Fund's nominee, if elected, would only constitute a minority of the Company's three person Board of Directors, the adoption of measures aimed at enhancing the value of the Common Stock would require the approval of at least one other director of the Company. If the Proposal is adopted, adoption of any such measure would require the approval of both of the other directors. There can be no assurance that the Board will approve such measures. However, the Fund believes that such results and approval are more likely if there are persons elected to the Company's Board of Directors who are committed to achieving such results. IF ELECTED, THE FUND'S NOMINEE IS COMMITTED TO ATTEMPTING TO PERSUADE THE COMPANY'S BOARD OF DIRECTORS TO ADOPT MEASURES AIMED AT ENHANCING THE VALUE OF THE COMMON STOCK.

                                                                    7

<PAGE>


        Mr. Eisenberg has consented to serve as a director if elected. If he should be unable to serve for any reason, which is not now anticipated, the persons named as proxies on the BLUE proxy form will vote for such other person as they shall determine in their discretion.

The Fund urges you to vote FOR the election of its nominee as director.

                    INFORMATION CONCERNING THE FUND AND ITS NOMINEE

        As of the Record Date, the Fund held 600,000 shares of the Company's Common Stock, which, as of the Record Date, constituted 14.1% of the Company's outstanding shares of Common Stock. As such, and based upon filings required to be made with the SEC by holders of 5% or more of the Company's Common Stock, the Fund was the second largest stockholder of the Company and the largest independent stockholder. The Fund was established, and is managed, by Eisenberg Partners, L.L.C., of which Jeffrey Eisenberg serves as the Manager. The Fund primarily seeks to make investments in publicly traded companies which appear to offer significant potential appreciation. The Fund is located at 77 West Wacker Drive, Chicago, Illinois, 60601. The telephone number of the Fund is (312) 456-9500.

        Mr. Jeffrey Eisenberg, who is 34 years old, is the Manager of Eisenberg Partners, L.L.C., the Manager of the Fund, a position he has held since 1996. Mr. Eisenberg is a licensed attorney and holds a J.D. degree from Northwestern University and an M.M. degree from the J.L. Kellogg Graduate School of Management at Northwestern University. He earned a B.B.A. degree in Finance and Real Estate from the University of Texas at Austin.

        Prior to founding Eisenberg Partners, L.L.C., Mr. Eisenberg served as a partner and Managing Director at the investment management firm of Angelo, Gordon & Co., L.P., in New York, New York, and was with that firm since 1992. While at Angelo, Gordon, Mr. Eisenberg specialized in identifying, analyzing and valuing public and private investments, conducting due diligence, negotiating with sellers, buyers, lenders, partners, and management, and monitoring and enhancing the value of investments. In this capacity, Mr. Eisenberg participated in a significant number of real estate investments, including with respect to commercial properties similar in nature to the commercial property which constitutes

the Company's primary asset and source of revenues.

The following is a list of all of the transactions in the Company's Common Stock by the Fund, its Manager and Mr. Eisenberg prior to the Record Date. None of the purchase price or market value of any of the shares of Common Stock held by the Fund is represented by funds borrowed or otherwise obtained for the purpose of acquiring or holding such securities. To the knowledge of the Fund, neither Mr. Eisenberg nor any of the associates of the Fund or of Mr. Eisenberg (referred to herein as the "Associates") own any Common Stock beneficially (other than indirectly through their respective interests in the Fund) or of record.

8

<PAGE>

| Date | Number of Shares | Price Paid |
|------|------------------|------------|
| 09/02/97 | 5,000 | $4.63 |
| 09/12/97 | 35,000 | $5.08 |
| 09/15/97 | 20,000 | $5.24 |
| 09/16/97 | 25,000 | $5.25 |
| 09/17/97 | 15,000 | $5.25 |
| 09/22/97 | 15,000 | $5.50 |
| 09/23/97 | 20,000 | $5.66 |
| 09/24/97 | 40,000 | $5.82 |
| 09/25/97 | 24,000 | $5.86 |
| 01/07/98 | 85,000 | $4.37 |
| 01/08/98 | 131,500 | $4.36 |
| 01/14/98 | 56,352 | $4.61 |
| 01/15/98 | 15,000 | $4.56 |
| 01/16/98 | 2,300 | $4.62 |
| 01/20/98 | 110,848 | $4.43 |
| Total | 600,000 | |

Neither the Fund, its Manager or its associates, or Mr. Eisenberg or his Associates, is now, or within the past year has been, a party to any contract, arrangements or understandings with any person with respect to any securities of the Company (including, but not limited to, joint ventures, loan or option arrangements, puts or calls, guarantees against loss or guarantees of profit, division of losses or profits, or the giving or withholding of proxies).

Except as described herein, neither the Fund, its Manager or its associates, or Mr. Eisenberg or his Associates, has any interest in the matters to be voted upon at the Annual Meeting, other than an interest as a stockholder in the Company. Neither the Fund, its Manager or Mr. Eisenberg or his Associates has been convicted in any criminal proceeding during the last ten years.

Neither the Fund, its Manager or its associates, or Mr. Eisenberg or his Associates, has any arrangement or understanding with any person with respect to: (i) any future employment with the Company or its

affiliates, or (ii) with respect to any future transactions to which the
Company or any of its affiliates will or may be a party.

        The Fund estimates that its total expenditures relating to the
solicitation of proxies for the Annual Meeting will be approximately
$60,000 (including, without limitation, costs related to advertising,
printing, fees of attorneys, public relations and transportation). Total
cash expenditures to date relating to this solicitation have been
approximately $10,000. Should the Company initiate, or cause the Fund to
initiate, litigation regarding this proxy solicitation, the Fund's
expenditures in connection with this solicitation would increase, perhaps
significantly. If successful in arranging a sale or merger of the Company

                                                                9


<PAGE>


or otherwise enhancing stockholder value, the Fund may seek reimbursement
of its expenses from the Company. The Fund does not currently expect to
submit such reimbursement to a vote of stockholders.

                            STOCKHOLDER PROPOSAL

        Section 5.06 of the Company's Second Amended and Restated Bylaws
currently provides that except as otherwise provided by law, the act of a
majority of the directors present at a meeting at which a quorum is present
at the time shall be the act of the Board of Directors. The Fund intends to
propose Section 5.06 of the Company's Second Amended and Restated Bylaws be
amended to provide as follows:

        "RESOLVED, that Section 5.06 of the Company's Second Amended and
        Restated Bylaws shall be deleted in its entirety and shall be
        replaced with the following: 'Section 5.06 Vote Required for
        Action. Except as otherwise provided by law, all action to be
        taken by the Board of Directors shall be taken by the unanimous
        vote of all of the directors then holding office. Notwithstanding
        any other provisions of these by-laws to the contrary, the
        affirmative vote of at least 75% of the shares entitled to vote at
        a meeting of stockholders shall be required to alter, amend or
        repeal this Section 5.06.'"

        As indicated above, the Fund will nominate Jeffrey Eisenberg to
serve as a Class I director of the Company. If Mr. Eisenberg is elected, he
would be only one of three directors. By proposing that all board actions
require unanimity, we are trying to empower Mr. Eisenberg to prevent
management's misguided expansions plans and to enable him to effectively
negotiate with the Company's management and remaining directors to seek to
maximize stockholder value through a sale or merger of the Company.
However, there can be no assurance that if the Fund's nominee is elected
and the Fund's proposal is adopted that the Company's performance will
improve or that stockholder value will be maximized or enhanced. If the
Fund's proposal is adopted, it could make the taking of action by the Board
of Directors more difficult, as the absence or incapacity of one director
could prevent the Board of Directors from acting. In addition, to the
extent a single director disagreed with any proposal, such director would
have a veto over the proposed action which could lead to deadlocks of the
Company's Board of Directors.

The Fund urges you to vote FOR the ratification of its proposal.

## RATIFICATION OF APPOINTMENT OF AUDITORS

The Company's management has selected Pender Newkirk & Company to continue as the Company's independent auditors. The Fund believes that management's selection of Pender Newkirk & Company as the Company's independent auditors for the year ending June 30, 1999, is an appropriate selection and it is soliciting proxies to vote in favor of the proposal to ratify such appointment.

10

<PAGE>

THE FUND URGES YOU TO VOTE YOUR SHARES "FOR" THE RATIFICATION OF THE APPOINTMENT OF THE COMPANY'S AUDITORS.

## REQUIRED VOTE

The affirmative vote of the holders of a majority of the shares of common stock represented in person or by proxy at the Annual Meeting is required to (i) elect the director, (ii) approve the Fund's proposal and (iii) ratify the selection of Pender Newkirk & Company as the Company's independent auditors for the year ended March 31, 2000. Abstentions and broker non-votes will not be counted and have no effect.

## OTHER MATTERS

Stockholders are referred to the Company's proxy statement, dated June 28, 1999, in connection with the solicitation by the Company's Board of Directors of proxies for the Annual Meeting, for information concerning: (i) beneficial ownership of Company securities by 5% or more holders, directors and executive officers of the Company, (ii) the committees of the Company's Board of Directors, (iii) the meetings of the Company's Board of Directors and all committees thereof, (iv) the background of the Company's nominee to the Company's Board of Directors, (v) the compensation and remuneration paid and payable to the Company's directors and management and (vi) the submission of stockholder proposals at the Company's 2000 annual meeting of stockholders. Neither the Fund nor Mr. Eisenberg has any independent knowledge as to the accuracy of the proxy statement of the Company's Board of Directors.

The entire expense of preparing and mailing this Proxy Statement and any other soliciting material and the total expenditures relating to the solicitation of proxies (including, without limitation, costs, if any, related to advertising, printing, attorneys, public relations, transportation and litigation) will be borne by the Fund. In addition to the use of the mails, proxies may be solicited, if required, by the Fund or employees of Eisenberg Partners, L.L.C., the Manager of the Fund, by telephone, telegraph, electronic mail, facsimile and personal solicitation. The Fund has also engaged Beacon Hill Partners, Inc. to solicit proxies on its behalf. Beacon Hill Partners will receive $20,000 for its activites on

behalf of the Fund plus an addition $20,000 if the Fund's nominee is elected and the Fund's proposal is approved. Banks, brokerage houses and other custodians, nominees and fiduciaries will be requested to forward solicitation material to certain beneficial owners of the Common Stock that such institutions hold, and the Fund will reimburse such institutions for their reasonable out-of-pocket expenses in complying with such request.

YOUR VOTE IS IMPORTANT

NO MATTER HOW MANY OR HOW FEW SHARES YOU OWN, PLEASE VOTE

11

<PAGE>

FOR THE FUND'S NOMINEE AND FOR THE OTHER PROPOSALS DESCRIBED HEREIN BY MARKING, SIGNING, DATING AND MAILING THE ENCLOSED BLUE PROXY FORM AS SOON AS POSSIBLE. ONLY YOUR LATEST DATED PROXY COUNTS. EVEN IF YOU HAVE ALREADY RETURNED A PROXY TO THE COMPANY'S BOARD OF DIRECTORS, YOU HAVE EVERY LEGAL RIGHT TO REVOKE IT BY SIGNING, DATING AND MAILING THE ENCLOSED BLUE PROXY FORM OR BY VOTING IN PERSON AT THE ANNUAL MEETING. NO OTHER ACTION, OTHER THAN SIGNING, DATING OR MAILING THE ENCLOSED BLUE PROXY FORM, OR VOTING IN PERSON AT THE ANNUAL MEETING, IS REQUIRED TO REVOKE A PROXY PREVIOUSLY GIVEN TO THE COMPANY'S BOARD OF DIRECTORS.

IMPORTANT

Your vote is important. No matter how many shares you own, please give the Fund your proxy FOR the election of Jeffrey Eisenberg as its Nominee, FOR the ratification of the appointment of independent auditors, and FOR the approval of the Bylaw Amendment Proposal by taking three steps:

1.    SIGNING the enclosed BLUE proxy card,

2.    DATING the enclosed BLUE proxy card, and

3.    MAILING the enclosed BLUE proxy card TODAY in the envelope provided (no postage is required if mailed in the United States). Registered holders may FAX BOTH SIDES of the enclosed BLUE proxy card TODAY to Beacon Hill Partners, Inc. at the number provided below.

If any of your shares are held in the name of a brokerage firm, bank, bank nominee or other institution, only it can vote such shares and only upon receipt of your specific instructions. Accordingly, please return the BLUE proxy card in the envelope provided or contact the person responsible for your account and instruct that person to execute the BLUE proxy card representing your shares. The Fund urges you to confirm in writing your instructions to the Fund in care of Beacon Hill Partners, Inc., at the address provided below so that the Fund will be aware of all instructions given and can attempt to ensure that such instructions are followed.

If you have any questions or require any additional information concerning this Proxy Statement, please contact, Beacon Hill Partners, Inc. at the address set forth below.

BEACON HILL PARTNERS, INC.
90 BROAD STREET
20TH FLOOR

NEW YORK, NEW YORK 10004
(212) 843-8500 (CALL COLLECT)
OR CALL TOLL-FREE (800) 475-9320
FAX: (212) 843-4384

12

<PAGE>


[FORM OF PROXY]

STOCKHOLDERS ARE URGED TO SPECIFY THEIR CHOICES, DATE, SIGN AND RETURN THIS
FORM OF BLUE PROXY IN THE ENCLOSED ENVELOPE, POSTAGE FOR WHICH HAS BEEN
PROVIDED. YOUR PROMPT RESPONSE WILL BE APPRECIATED.

EXCAL ENTERPRISES, INC.

PROXY SOLICITED ON BEHALF OF EP OPPORTUNITY FUND, L.L.C.

        The undersigned, having received the Proxy Statement for the
Company's 1999 annual meeting relating to the proposals listed below,
appoints Jeffrey Eisenberg, Eda Eisenberg and Susan Rabinowitz, and each or
either of them, as proxies, with full power of substitution and
resubstitution, to vote all shares of Common Stock of Excal Enterprises,
Inc. which the undersigned is entitled to vote, in the manner specified.

THIS PROXY WILL BE VOTED AS DIRECTED, OR IF NO DIRECTION IS INDICATED, WILL
BE VOTED "FOR" EACH OF THE PROPOSALS.

Proposal 1:    Election of Directors

Election of Jeffrey Eisenberg for a term expiring at the 2002 annual
meeting of stockholders.

                |__| FOR                        |__| WITHHOLD

Proposal 2: Amendment of Bylaws

Amend the Company's Second Amended and Restated Bylaws to provide that all
action to be taken by the Board of Directors shall be taken by the
unanimous vote of all of the directors then holding office requiring the
affirmative vote of at least 75% of the shares entitled to vote at a
meeting of stockholders to amend the provision.

            |__| FOR       |__| AGAINST    |__| ABSTAIN

Proposal 3: Relationship with Independent Certified Public Accountant

Pender Newkirk & Company to serve as the independent certified public
accountants for the Company for the current fiscal year ended March 31, 2000.

            |__| FOR       |__| AGAINST    |__| ABSTAIN

        Should any other matters requiring a vote of the shareholders
arise, the above-named proxies are authorized to vote the same in

                                                            1

<PAGE>

accordance with their best judgment in the interest of the Company. The
Board of Directors is not aware of any matter that is to be presented for
action at the meeting other than the matters set forth herein.

    This proxy revokes all prior proxies and voting instructions.


Dated:          , 1999         _____
                           (SEAL)

                           _____
                           (SEAL)


                           (Please sign exactly as name or names
                           appear hereon. Executors, administrators,
                           trustees or other representatives
                           should so indicate when signing.)

                           2

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----

# RIGHTS AGREEMENT

between

## ASSIX INTERNATIONAL, INC.

and

## REGISTRAR AND TRANSFER COMPANY

Rights Agent

Dated as of April 18, 1994



## TABLE OF CONTENTS

Page

Section 1.   Certain Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Section 2.   Appointment of Rights Agent  . . . . . . . . . . . . . . . . . . . . . . 6

Section 3.   Issuance of Right Certificates  . . . . . . . . . . . . . . . . . . . . . 6

Section 4.   Form of Right Certificates . . . . . . . . . . . . . . . . . . . . . . . . 8

Section 5.   Countersignature and Registration . . . . . . . . . . . . . . . . . . . 8

Section 6.   Transfer, Split Up, Combination and Exchange of
             Right Certificates; Mutilated, Destroyed, Lost
             or Stolen Right Certificates . . . . . . . . . . . . . . . . . . . . . . . 9

Section 7.   Exercise of Rights; Purchase Price;
             Expiration Date of Rights . . . . . . . . . . . . . . . . . . . . . . . 10

Section 8.   Cancellation and Destruction of Right Certificates . . . . . . . . . . . 11

Section 9.   Reservation and Availability of Shares of
             Series A Preferred Stock . . . . . . . . . . . . . . . . . . . . . . . 12

Section 10.  Series A Preferred Stock Record Date . . . . . . . . . . . . . . . . . 13

Section 11.  Adjustments to Number and Kind of Shares,
             Number of Rights or Purchase Price . . . . . . . . . . . . . . . . . . 13

Section 12.  Certification of Adjustments . . . . . . . . . . . . . . . . . . . . . . 22

Section 13.  Consolidation, Merger or Sale or Transfer
             of Assets or Earning Power  . . . . . . . . . . . . . . . . . . . . . . 22

Section 14.  Fractional Rights and Fractional Shares  . . . . . . . . . . . . . . . . 26

Section 15.  Rights of Action  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Section 16.  Agreement of Right Holders . . . . . . . . . . . . . . . . . . . . . . 27

Section 17.  Right Certificate Holder Not Deemed a Stockholder . . . . . . . . . . 28

Section 18.  Concerning the Rights Agent . . . . . . . . . . . . . . . . . . . . . . 28

Section 19.    Merger or Consolidation or Change of Name
               of Rights Agent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Section 20.    Duties of Rights Agent  . . . . . . . . . . . . . . . . . . . . . . . . . 29

Section 21.    Change of Rights Agent . . . . . . . . . . . . . . . . . . . . . . . . 31

Section 22.    Issuance of New Right Certificates  . . . . . . . . . . . . . . . . . 32

Section 23.    Redemption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Section 24.    Exchange  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Section 25.    Notice of Proposed Actions  . . . . . . . . . . . . . . . . . . . . . 34

Section 26.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Section 27.    Supplements and Amendments . . . . . . . . . . . . . . . . . . . . 36

Section 28.    Successors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Section 29.    Benefits of this Rights Agreement . . . . . . . . . . . . . . . . . . 37

Section 30.    Delaware Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Section 31.    Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Section 32.    Descriptive Headings  . . . . . . . . . . . . . . . . . . . . . . . . . 37

Section 33.    Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## RIGHTS AGREEMENT

Agreement ("Rights Agreement"), dated as of April 18, 1994, between Assix International, Inc., a Delaware corporation (the "Company"), and Registrar and Transfer Company (the "Rights Agent").

## W I T N E S S E T H :

WHEREAS, on April 18, 1994 the Board of Directors of the Company (i) authorized the issuance and declared a dividend of one right (a "Right") for each share of the Common Stock, par value $0.001 per share ("Common Stock"), of the Company outstanding as of the close of business on April 29, 1994 (the "Record Date"), each Right representing the right to purchase, on the terms and conditions contained herein, one one-hundredth of a share (subject to adjustment) of Series A Participating Preferred Stock, par value $0.01 per share ("Series A Preferred Stock"), of the Company having the rights and preferences set forth in the form of Certificate of Designations attached hereto as Exhibit A, and (ii) further authorized the issuance of one Right (subject to adjustment) with respect to each share of Common Stock that shall become outstanding (whether originally issued or delivered from the Company's treasury) between the Record Date and the Distribution Date (as defined herein);

NOW, THEREFORE, in consideration of the premises and the mutual agreements set forth herein, the parties agree as follows:

Section 1.  Certain Definitions.  For purposes of this Rights Agreement, the following terms shall have the meanings indicated:

(a)     "Acquiring Person" shall mean any Person (as hereinafter defined) who or which, together with all Affiliates (as hereinafter defined) and Associates (as hereinafter defined) of such Person, shall be the Beneficial Owner (as hereinafter defined) of 15% or more of the outstanding Common Stock, provided that an Acquiring Person shall not include an Exempt Person (as hereinafter defined), and further provided that any Person who, together with all Affiliates and Associates of such Person, is the Beneficial Owner of 15% or more of the outstanding Common Stock on the date of this Agreement, shall not be an Acquiring Person unless and until such person, together with all Affiliates and Associates of such Person, shall become the Beneficial Owner of any additional shares of Common Stock other than pursuant to a dividend or distribution paid or made pro rata to all holders of Common Stock or pursuant to the grant or exercise of employee stock options or employee stock rights pursuant to the Company's 1988 Stock Option Plan, as amended.  Notwithstanding the foregoing, no Person shall become an "Acquiring Person" as a result of an acquisition of shares of Common Stock by the Company which, by reducing the number of such shares outstanding, increases the proportionate number of shares beneficially owned by such person to 15% or more of the outstanding Common Stock, provided that if such Person becomes the Beneficial Owner

of 15% or more of the outstanding Common Stock by reason of share acquisitions by the Company and, after such share acquisitions by the Company, becomes the Beneficial Owner of any additional shares of Common Stock other than pursuant to a dividend or distribution paid or made pro rata to all holders of shares of Common Stock, such Person shall be deemed to be an "Acquiring Person." Notwithstanding the foregoing, if the Board of Directors of the Company determines in good faith that a Person who would otherwise be an "Acquiring Person," as defined pursuant to the foregoing provisions of this paragraph (a), has become such inadvertently, and such Person divests as promptly as practicable a sufficient number of Common Shares so that such Person would no longer be an "Acquiring Person," as defined pursuant to the foregoing provisions of this paragraph (a), then such Person shall not be deemed to be an "Acquiring Person" for any purposes of this Agreement. The word "outstanding," when used with reference to a Person's Beneficial Ownership of shares of Common Stock of the Company, shall mean the number of such shares then issued and outstanding together with the number of such shares not then issued and outstanding which such Person would be deemed to own beneficially hereunder.

(b)     "Adjustment Shares" shall have the meaning set forth in Section 11(a)(ii) hereof.

(c)     "Affiliate" and "Associate" shall have the respective meanings ascribed to such terms in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), as in effect on the date of this Rights Agreement.

(d)     A Person shall be deemed the "Beneficial Owner" of, and shall be deemed to "beneficially own," any shares of Common Stock:

(i) which such Person or any of such Person's Affiliates or Associates beneficially owns, directly or indirectly;

(ii) which such Person or any of such Person's Affiliates or Associates has (A) the right to acquire (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, whether or not in writing, or upon the exercise of conversion rights, exchange rights, rights, warrants or options, or otherwise, provided that a Person shall not be deemed the "Beneficial Owner" of, or to "beneficially own," (x) securities tendered pursuant to a tender or exchange offer made by such Person or any of such Person's Affiliates or Associates until such tendered securities are accepted for purchase or exchange or (y) securities which such Person has a right to acquire on the exercise of Rights at any time prior to the occurrence of a Section 11(a)(ii) Event (as hereinafter defined) or (z) securities issuable upon exercise of Rights from and after the occurrence of a Section 11(a)(ii) Event if such Rights were acquired by such Person or any of such Person's Affiliates or Associates prior to the Distribution Date or pursuant to Section 22 hereof ("original

- 2 -

Rights") or pursuant to Section 11(i) or Section 11(n) with respect to an adjustment to original Rights; or (B) the right to vote pursuant to any agreement, arrangement or understanding (whether or not in writing), provided that a Person shall not be deemed the "Beneficial Owner" of, or to "beneficially own," any securities if the agreement, arrangement or understanding to vote such security (i) arises solely from a revocable proxy or consent given in response to a public proxy or consent solicitation made pursuant to, and in accordance with, the applicable rules and regulations of the Exchange Act and (ii) is not also then reportable on Schedule 13D under the Exchange Act (or any comparable successor report); or

(iii) which are beneficially owned, directly or indirectly, by any other Person with which such Person or any of such Person's Affiliates or Associates has any agreement, arrangement or understanding, whether or not in writing, for the purpose of acquiring, holding, voting (except as described in clause (B) of subparagraph (ii) of this paragraph (d)) or disposing of any securities of the Company.  Notwithstanding anything in this paragraph (d) to the contrary, a Person engaged in the business of underwriting securities shall not be deemed the "Beneficial Owner" of, or to "beneficially own," any securities acquired in good faith in a firm commitment underwriting until the expiration of forty days after the date of such acquisition.

(e)    "Board of Directors" shall mean the Board of Directors of the Company or any duly authorized committee thereof.

(f)    "Business Day" shall mean any day other than a Saturday, Sunday, or a day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

(g)    "Close of business" on any given date shall mean 5:00 P.M., New York time, on such date, provided that if such date is not a Business Day it shall mean 5:00 P.M., New York time, on the next succeeding Business Day.

(h)    "Common Stock" when used with reference to the Company shall mean the Common Stock (currently $0.001 par value per share) of the Company. "Common Stock" when used with reference to any Person other than the Company which shall be organized in corporate form shall mean the capital stock or other equity security with the greatest per share voting power of such Person.  "Common Stock" when used with reference to any Person other than the Company which shall not be organized in corporate form shall mean units of beneficial interest which shall represent the right to participate in profits, losses, deductions and credits of such Person and which shall be entitled to exercise the greatest voting power per unit of such Person.

(i)    "Common Stock equivalents" shall have the meaning set forth in Section 11(a)(iii) hereof.

- 3 -

(j)    "Current Market Price" shall have the meaning set forth in Section 11(d) hereof.

(k)    "Current Value" shall have the meaning set forth in Section 11(a)(iii) hereof.

(l)    "Distribution Date" shall have the meaning set forth in Section 3(a) hereof.

(m)    "Equivalent Series A Preferred Stock" shall have the meaning set forth in Section 11(b) hereof.

(n)    "Exchange Act" shall have the meaning set forth in Section 1(c) hereof.

(o)    "Exchange Ratio" shall have the meaning set forth in Section 24(a) hereof.

(p)    "Exempt Person" shall mean the Company, any Subsidiary of the Company, any employee benefit plan or employee stock plan of the Company or of any Subsidiary of the Company, or any person or entity organized, appointed or established for or pursuant to the terms of any such plan or for the purpose of funding any such plan or funding other employee benefits for employees of the Company or of any Subsidiary of the Company.

(q)    "Expiration Date" shall have the meaning set forth in Section 7(a) hereof.

(r)    "Final Expiration Date" shall have the meaning set forth in Section 7(a) hereof.

(s)    "invalidation time" shall have the meaning set forth in Section 11(a)(ii) hereof.

(t)    "NASDAQ" shall have the meaning set forth in Section 11(d) hereof.

(u)    "NYSE" shall mean the New York Stock Exchange.

(v)    "Person" shall mean any individual, firm, corporation, partnership or other entity.

(w)    "Principal Party" shall have the meaning set forth in Section 13(b) hereof.

- 4 -

(x)    "Purchase Price" shall have the meaning set forth in Section 4 hereof.

(y)    "Redemption Price" shall have the meaning set forth in Section 23(a) hereof.

(z)    "Right Certificate" shall have the meaning set forth in Section 3(a) hereof.

(aa)    "Section 11(a)(ii) Event" shall mean any instance in which any Person, alone or together with its Affiliates and Associates, shall become an Acquiring Person.

(bb)    "Section 11(a)(ii) Trigger Date" shall have the meaning set forth in Section 11(a)(iii) hereof.

(cc)    "Section 13 Event" shall mean any event described in clause (i), (ii) or (iii) of Section 13(a) hereof.

(dd)    "Securities Act" shall mean the Securities Act of 1933, as amended.

(ee)    "Spread" shall have the meaning set forth in Section 11(a)(iii) hereof.

(ff)    "Stock Acquisition Date" shall mean the first date of public announcement (which, for purposes of this definition shall include, without limitation, a report filed pursuant to the Exchange Act) by the Company or an Acquiring Person that an Acquiring Person has become such or such earlier date as a majority of the Board of Directors shall become aware of the existence of an Acquiring Person.

(gg)    "Substitution Period" shall have the meaning set forth in Section 11(a)(iii) hereof.

(hh)    "Subsidiary" of a Person shall mean any corporation or other entity of which securities or other ownership interests having ordinary voting power sufficient to elect a majority of the board of directors or other persons performing similar functions are beneficially owned, directly or indirectly, by such Person and any corporation or other entity that is otherwise controlled by such Person.

(ii)    "Summary of Rights" shall have the meaning set forth in Section 3(b) hereof.

- 5 -

(jj)     "Trading Day" shall have the meaning set forth in Section 11(d) hereof.

(kk)     "Triggering Event" shall mean any Section 11(a)(ii) Event or Section 13 Event.

Any determination required by the definitions contained or referred to in this Section 1 shall be made by the Board of Directors in good faith.

Section 2.     <u>Appointment of Rights Agent</u>.     The Company hereby appoints the Rights Agent to act as agent for the Company in accordance with the terms and conditions hereof, and the Rights Agent hereby accepts such appointment.     The Company may from time to time appoint such Co-Rights Agents as it may deem necessary or desirable.

Section 3.     <u>Issuance of Right Certificates</u>.

(a)     Until the close of business on the day (the "Distribution Date") which is the earlier of (i) the tenth day after the Stock Acquisition Date or (ii) the tenth Business Day (or such later day as may be determined by action of the Board of Directors taken prior to the close of business on such tenth Business Day and prior to such time as any Person becomes an Acquiring Person) following the commencement by any Person (other than an Exempt Person) of, or the first public announcement of the intent of any Person (other than an Exempt Person) to commence, a tender or exchange offer upon the successful consummation of which such Person, together with its Affiliates and Associates, would be the Beneficial Owner of 15% or more of the outstanding Common Stock (irrespective of whether any shares are actually purchased pursuant to any such offer), (x) the Rights will be evidenced (subject to the provisions of Section 3(c) hereof) by the certificates for the Common Stock registered in the names of the holders of the Common Stock and not by separate Right Certificates, and (y) each Right will be transferable only in connection with the transfer of a share (subject to adjustment as hereinafter provided) of Common Stock; <u>provided</u> that if the Distribution Date would be prior to the Record Date, the Record Date shall be the Distribution Date; and <u>provided</u>, <u>further</u>, that if a tender offer or exchange offer referred to in clause (ii) above is canceled or withdrawn prior to the Distribution Date, such offer shall be deemed, for purposes of this Rights Agreement, never to have been made.   As soon as practicable after the Distribution Date, the Rights Agent will mail, by first-class, postage-prepaid mail, to each record holder of the Common Stock as of the close of business on the Distribution Date, as shown by the records of the Company, at the address of such holder shown on such records, a Right Certificate in substantially the form of Exhibit B hereto ("Right Certificate") evidencing one Right for each share of Common Stock so held, subject to adjustment as provided herein.   In the event that an adjustment in the number of Rights per share of Common Stock has been made pursuant to Section 11(i) or Section 11(n) hereof, at the time of distribution of the Right Certificates the Company shall make the necessary and appropriate rounding

- 6 -

(jj)     "Trading Day" shall have the meaning set forth in Section 11(d) hereof.

(kk)     "Triggering Event" shall mean any Section 11(a)(ii) Event or Section 13 Event.

Any determination required by the definitions contained or referred to in this Section 1 shall be made by the Board of Directors in good faith.

Section 2.   Appointment of Rights Agent.   The Company hereby appoints the Rights Agent to act as agent for the Company in accordance with the terms and conditions hereof, and the Rights Agent hereby accepts such appointment.   The Company may from time to time appoint such Co-Rights Agents as it may deem necessary or desirable.

Section 3.   Issuance of Right Certificates.

(a)     Until the close of business on the day (the "Distribution Date") which is the earlier of (i) the tenth day after the Stock Acquisition Date or (ii) the tenth Business Day (or such later day as may be determined by action of the Board of Directors taken prior to the close of business on such tenth Business Day and prior to such time as any Person becomes an Acquiring Person) following the commencement by any Person (other than an Exempt Person) of, or the first public announcement of the intent of any Person (other than an Exempt Person) to commence, a tender or exchange offer upon the successful consummation of which such Person, together with its Affiliates and Associates, would be the Beneficial Owner of 15% or more of the outstanding Common Stock (irrespective of whether any shares are actually purchased pursuant to any such offer), (x) the Rights will be evidenced (subject to the provisions of Section 3(c) hereof) by the certificates for the Common Stock registered in the names of the holders of the Common Stock and not by separate Right Certificates, and (y) each Right will be transferable only in connection with the transfer of a share (subject to adjustment as hereinafter provided) of Common Stock; provided that if the Distribution Date would be prior to the Record Date, the Record Date shall be the Distribution Date; and provided, further, that if a tender offer or exchange offer referred to in clause (ii) above is canceled or withdrawn prior to the Distribution Date, such offer shall be deemed, for purposes of this Rights Agreement, never to have been made.   As soon as practicable after the Distribution Date, the Rights Agent will mail, by first-class, postage-prepaid mail, to each record holder of the Common Stock as of the close of business on the Distribution Date, as shown by the records of the Company, at the address of such holder shown on such records, a Right Certificate in substantially the form of Exhibit B hereto ("Right Certificate") evidencing one Right for each share of Common Stock so held, subject to adjustment as provided herein.   In the event that an adjustment in the number of Rights per share of Common Stock has been made pursuant to Section 11(i) or Section 11(n) hereof, at the time of distribution of the Right Certificates the Company shall make the necessary and appropriate rounding

- 6 -

adjustments (in accordance with Section 14(a) hereof) so that Right Certificates representing only whole numbers of Rights are distributed and cash is paid in lieu of any fractional Rights. As of and after the Distribution Date the Rights will be evidenced solely by such Right Certificates.

(b)     On the Record Date or as soon as practicable thereafter, the Company will send a copy of a Summary of Rights to Purchase Series A Preferred Stock, substantially in the form attached hereto as Exhibit C ("Summary of Rights"), by first-class, postage prepaid mail, to each record holder of Common Stock as of the close of business on the Record Date, at the address of such holder shown on the records of the Company.

(c)     With respect to certificates for Common Stock outstanding as of the Record Date, until the Distribution Date (or, if earlier, the Expiration Date), the Rights will be evidenced by such certificates for Common Stock registered in the names of the holders thereof together with a copy of the Summary of Rights. Until the Distribution Date (or, if earlier, the Expiration Date), the surrender for transfer of any certificate for Common Stock outstanding on the Record Date, with or without a copy of the Summary of Rights, shall (subject to the provisions of Section 11(a)(ii) and the other provisions hereof) also constitute the surrender for transfer of the Rights associated with the Common Stock represented thereby.

(d)     Subject to the provisions of Section 11(a)(ii) and the other provisions hereof, rights shall be issued in respect of all shares of Common Stock that become outstanding after the Record Date but prior to the earlier of the Distribution Date or the Expiration Date and, in certain circumstances provided for in Section 22 hereof, may be issued in respect of shares of Common Stock that become outstanding after the Distribution Date. Certificates issued for Common Stock (including, without limitation, certificates issued upon original issuance, disposition from the Company's treasury or transfer or exchange of Common Stock) after the Record Date but prior to the earlier of the Distribution Date or the Expiration Date (or, in certain circumstances as provided in Section 22 hereof, after the Distribution Date) shall have impressed on, printed on, written on or otherwise affixed to them the following legend:

This certificate also evidences and entitles the holder hereof to certain Rights as set forth in a Rights Agreement between Assix International, Inc. and Registrar and Transfer Company, as Rights Agent, dated as of April 18, 1994, and as amended from time to time (the "Rights Agreement"), the terms of which are incorporated herein by reference and a copy of which is on file at the principal executive office of Assix International, Inc. Under certain circumstances, as set forth in the Rights Agreement, each Rights will be evidenced by separate certificates and will no longer be evidenced by this certificate. Assix International, Inc. will mail to the holder of this certificate a copy of the Rights Agreement without charge within five days after receipt

- 7 -

by it of a written request therefor.  <u>Rights issued to or beneficially owned by a Person who is or becomes an Acquiring Person or an Associate or Affiliate of such Acquiring Person (as such terms are defined in the Rights Agreement) or, under certain circumstances, transferees thereof, will become null and void as provided in Section 11(a)(ii) of the Rights Agreement and thereafter may not be transferred to any Person.</u>

With respect to such certificates containing the foregoing legend, the Rights associated with the Common Stock represented by such certificates shall, until the Distribution Date, be evidenced by such certificates alone, and the surrender for transfer of any such certificate shall (subject to the provisions of Section 11(a)(ii) and the other provisions hereof) also constitute the surrender for transfer of the Rights associated with the Common Stock represented thereby.

Section 4.  <u>Form of Right Certificates</u>.  The Right Certificates (and the forms of election to purchase shares and of assignment to be printed on the reverse thereof), when, as and if issued, shall be substantially in the form set forth in Exhibit B attached hereto and may have such marks of identification or designation and such legends, summaries or endorsements printed thereon as the Company may deem appropriate and as are not inconsistent with the provisions of this Rights Agreement, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any stock exchange on which the Rights may from time to time be listed, or to conform to usage.  Subject to the provisions of Sections 11 and 22 hereof, the Right Certificates, whenever issued, evidencing the Rights issued on the Record Date shall be dated as of the Record Date, and Right Certificates evidencing Rights issued after the Record Date shall be dated as of the date of such issuance, and on their face Right Certificates shall entitle the holders thereof to purchase one one-hundredth of one share of Series A Preferred Stock, or other securities or property as provided herein, as the same may from time to time be adjusted as provided herein, at the price per one one-hundredth of a share set forth therein, as the same may from time to time be adjusted as provided herein (the "Purchase Price").

Section 5.  <u>Countersignature and Registration</u>.

(a)    The Right Certificates shall be executed on behalf of the Company by its Chairman of the Board, its Chief Executive Officer, any Senior Vice President, any Executive Vice President, or the Treasurer, either manually or by facsimile signature, and have affixed thereto the Company's seal or a facsimile thereof which shall be attested by the Secretary or an Assistant Secretary of the Company, either manually or by facsimile signature.  The Right Certificates shall be manually countersigned by the Rights Agent and shall not be valid for any purpose unless so countersigned.  In case any officer of the Company who shall have signed any of the Right Certificates shall cease to be such officer of the Company before countersignature by the Rights Agent and issuance and delivery by the Company, such Right Certificates, nevertheless, may be countersigned

- 8 -

by the Rights Agent, issued and delivered with the same force and effect as though the person who signed such Right Certificates had not ceased to be such officer of the Company; and any Right Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Right Certificate, shall be a proper officer of the Company to sign such Right Certificate, although at the date of the execution of this Rights Agreement any such person was not such an officer.

(b)    Following the Distribution Date, the Rights Agent will keep or cause to be kept, at its principal office, books for registration and transfer of the Right Certificates issued hereunder.    Such books shall show the names and addresses of the respective holders of the Right Certificates, the number of Rights evidenced on its face by each of the Right Certificates, the date of each of the Right Certificates, and the certificate numbers for each of the Right Certificates.

Section 6.    <u>Transfer, Split Up, Combination and Exchange of Right Certificates; Mutilated, Destroyed, Lost or Stolen Right Certificates</u>.

(a)    Subject to the provisions of Section 11(a)(ii) and the other provisions hereof, at any time after the close of business on the Distribution Date and at or prior to the close of business on the Expiration Date, any Right Certificate or Certificates may be transferred or split up, combined or exchanged for another Right Certificate or Right Certificates, entitling the registered holder to purchase a like number of one one-hundredths of a share of Series A Preferred Stock as the Right Certificate or Right Certificates surrendered then entitled such holder to purchase.    Any registered holder desiring to transfer any Right Certificate shall surrender the Right Certificate at the principal office of the Rights Agent with the form of assignment on the reverse side thereof duly endorsed (or enclose with such Right Certificate a written instrument of transfer in form satisfactory to the Company and the Rights Agent), duly executed by the registered holder thereof or his attorney duly authorized in writing, and with such signature duly guaranteed.    Any registered holder desiring to split up, combine or exchange any Right Certificate shall make such request in writing delivered to the Rights Agent, and shall surrender the Right Certificate or Right Certificates to be split up, combined or exchanged at the principal office of the Rights Agent.    Thereupon the Rights Agent, subject to the provisions of Section 11(a)(ii) and the other provisions hereof, shall countersign (by manual signature) and deliver to the person entitled thereto a Right Certificate or Right Certificates, as the case may be, as so requested.    The Company may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer, split up, combination or exchange of Right Certificates.

(b)    Subject to the provisions of Section 11(a)(ii) and the other provisions hereof, upon receipt by the Company and the Rights Agent of evidence reasonably satisfactory to them of the loss, theft, destruction or mutilation of a Right Certificate, and, in case of loss, theft or destruction, of indemnity or security reasonably satisfactory to them, and, if requested by the Company, reimbursement to the Company

- 9 -

of all reasonable expenses incidental thereto, and upon surrender to the Rights Agent and cancellation of the Right Certificate if mutilated, the Company will execute and deliver a new Right Certificate of like tenor to the Rights Agent for delivery to the registered owner in lieu of the Right Certificate so lost, stolen, destroyed or mutilated.

Section 7.    <u>Exercise of Rights; Purchase Price; Expiration Date of Rights.</u>

(a)    Except as otherwise provided herein, the Rights shall become exercisable at the close of business on the Distribution Date, and thereafter may be exercised in whole or in part to purchase shares of Series A Preferred Stock upon surrender of the Right Certificate, with the form of election to purchase on the reverse side thereof duly executed (with such signature duly guaranteed), to the Rights Agent at its principal office, together with payment of the aggregate Purchase Price (subject to adjustment as hereinafter provided) with respect to the number of one one-hundredths of a share of Series A Preferred Stock (except as otherwise provided herein) as to which such surrendered Rights are then being exercised, at or prior to the close of business on the date (the "Expiration Date") which is the earlier of (i) April 18, 2004 (the "Final Expiration Date"), (ii) the time at which the Rights are redeemed as provided in Section 23 hereof, or (iii) the time at which the Rights are exchanged as provided in Section 24 hereof.

(b)    The Purchase Price shall initially be $ 10 for each one one-hundredth of a share of Series A Preferred Stock issued pursuant to the exercise of a Right. The Purchase Price and the number of one one-hundredths of a share of Series A Preferred Stock or other securities to be acquired upon exercise of a Right shall be subject to adjustment from time to time as provided in Sections 11 and 13 hereof.  The Purchase Price shall be payable in lawful money of the United States of America, in accordance with Section 7(c) hereof.

(c)    Except as otherwise provided herein, upon receipt of a Right Certificate representing exercisable Rights with the form of election to purchase duly executed, accompanied by payment of the aggregate Purchase Price for the number of one one-hundredths of a share of Series A Preferred Stock to be purchased and an amount equal to any applicable transfer tax, by cash, certified or official bank check or money order payable to the order of the Company or the Rights Agent, the Rights Agent shall, subject to Section 20(j) hereof, thereupon promptly (i) requisition from any transfer agent of the Series A Preferred Stock certificates for the number of shares of Series A Preferred Stock so elected to be purchased (and/or requisition from the depositary agent depositary receipts representing interests in such number of fractional shares of Series A Preferred Stock as are to be purchased, in which case certificates for the fractional shares of Series A Preferred Stock so represented shall be deposited with the depositary agent) and the Company will comply and hereby authorizes and directs such transfer agent (and any such depositary agent) to comply with all such requests, (ii) requisition from the Company the amount of cash to be paid in lieu of issuance of fractional shares in accordance with

- 10 -

Section 14(b) hereof, and (iii) promptly after receipt of such Series A Preferred Stock certificates cause the same to be delivered to or upon the order of the registered holder of such Right Certificate, registered in such name or names as may be designated by such holder, or, when appropriate, after receipt promptly deliver such depositary receipts and cash to or upon the order of the registered holder of such Right Certificate; provided, that in the case of a purchase of securities, other than Series A Preferred Stock, pursuant to Section 11 or Section 13 hereof, the Rights Agent shall promptly take the appropriate actions corresponding to the foregoing clauses (i) through (iii).  In the event that the Company is obligated to issue other securities of the Company, pay cash and/or distribute other property pursuant to Section 11(a) hereof, the Company will make all arrangements necessary so that such other securities, cash and/or other property are available for distribution by the Rights Agent, if and when appropriate.

(d)    Except as otherwise provided herein, in case the registered holder of any Right Certificate shall exercise less than all the Rights evidenced thereby, a new Right Certificate evidencing Rights equivalent to the Rights remaining unexercised shall be issued by the Rights Agent to the registered holder of such Right Certificate or to his duly authorized assigns, subject to the provisions of Section 14 hereof.

(e)    Notwithstanding anything in this Agreement to the contrary, neither the Rights Agent nor the Company shall be obligated to undertake any action with respect to a registered holder upon the occurrence of any purported exercise as set forth in this Section 7 unless such registered holder shall have (i) completed and signed the certificate contained in the form of election to purchase set forth on the reverse side of the Right Certificate surrendered for such exercise and (ii) provided such additional evidence of the identity of the Beneficial Owner (or former Beneficial Owner) or Affiliates or Associates thereof as the Company shall reasonably request.

Section 8.  Cancellation and Destruction of Right Certificates.

All Right Certificates surrendered for the purpose of exercise, transfer, split up, combination or exchange shall, if surrendered to the Company or to any of its agents, be delivered to the Rights Agent for cancellation or in canceled form or, if surrendered to the Rights Agent, shall be canceled by it, and no Right Certificates shall be issued in lieu thereof except as expressly permitted by any of the provisions of this Rights Agreement.  The Company shall deliver to the Rights Agent for cancellation and retirement, and the Rights Agent shall so cancel and retire, any Right Certificate purchased or acquired by the Company otherwise than upon the exercise thereof.  The Rights Agent shall deliver all canceled Right Certificates to the Company or shall, at the written request of the Company, destroy such canceled Right Certificates, and in such case shall deliver a certificate of destruction thereof to the Company.

- 11 -

Section 9.  <u>Reservation and Availability of Shares of Series A Preferred Stock</u>.

(a)    The Company covenants and agrees that at all times it will cause to be reserved and kept available, out of and to the extent of its authorized and unissued shares of Series A Preferred Stock not reserved for another purpose (and, following the occurrence of a Triggering Event, shares of Common Stock and other securities) or shares of Series A Preferred Stock (and, following the occurrence of a Triggering Event, shares of Common Stock and other securities) held in its treasury, the number of shares of Series A Preferred Stock (and, following the occurrence of a Triggering Event, shares of Common Stock and other securities) that, as provided in this Agreement, including Section 11(a)(iii) hereof, will be sufficient to permit the exercise in full of all outstanding Rights, provided that the Company shall not be required to reserve and keep available shares of Common Stock or other securities sufficient to permit the exercise in full of all outstanding Rights pursuant to the adjustments set forth in Section 11(a)(ii), Section 11(a)(iii) or Section 13 hereof unless the Rights become exercisable pursuant to such adjustments, and then only to the extent the Rights become exercisable pursuant to such adjustments.

(b)    So long as the shares of Series A Preferred Stock (and, following the occurrence of a Triggering Event, shares of Common Stock and other securities) issuable and deliverable upon the exercise of Rights may be listed on any national securities exchange, the Company shall use its best efforts to cause, from and after such time as the Rights become exercisable, all shares reserved for such issuance to be listed on such exchange upon official notice of issuance upon such exercise.

(c)    From and after such time as the Rights become exercisable, the Company shall use its best efforts to, if then necessary to permit the issuance of shares of Series A Preferred Stock (and, following the occurrence of a Triggering Event, shares of Common Stock and other securities) upon the exercise of Rights, register and qualify such shares of Series A Preferred Stock (and, following the occurrence of a Triggering Event, shares of Common Stock and other securities) under the Securities Act and any applicable state securities or "blue sky" laws (to the extent exemptions therefrom are not available), cause such registration statement and qualifications to become effective as soon as possible after such filing and keep such registration and qualifications effective until the earlier of the date as of which the Rights are no longer exercisable for such securities and the Expiration Date of the Rights.  The Company may temporarily suspend, for a period of time not to exceed ninety days, the exercisability of the Rights in order to prepare and file a registration statement under the Securities Act and permit it to become effective.  Upon any such suspension, the Company shall issue a public announcement stating that the exercisability of the Rights has been temporarily suspended, as well as a public announcement at such time as the suspension is no longer in effect.  Notwithstanding any provision of this Agreement to the contrary, the Rights shall not be exercisable in any jurisdiction unless the requisite qualification in such jurisdiction shall have been obtained

- 12 -

and until a registration statement under the Securities Act (if required) shall have been declared effective.

(d)    The Company covenants and agrees that it will take all such action as may be necessary to insure that all shares of Series A Preferred Stock (and, following the occurrence of a Triggering Event, shares of Common Stock and other securities) delivered upon exercise of Rights shall, to the extent applicable, at the time of delivery of the certificates for such shares (subject to payment of the aggregate Purchase Price in respect thereof), be duly and validly authorized and issued and fully paid and nonassessable shares in accordance with applicable law.

(e)    The Company further covenants and agrees that it will pay when due and payable any and all federal and state transfer taxes and charges which may be payable in respect of the issuance or delivery of the Right Certificates or of any shares of Series A Preferred Stock (or other securities, as the case may be) upon the exercise of Rights.  The Company shall not, however, be required to pay any transfer tax which may be payable in respect of any transfer or delivery of Right Certificates to a Person other than, or the issuance or delivery of certificates for Series A Preferred Stock (or other securities, as the case may be) upon exercise of Rights in a name other than that of, the registered holder of the Right Certificate, and the Company shall not be required to issue or deliver a Right Certificate or certificate for Series A Preferred Stock (or other securities, as the case may be) to a person other than such registered holder until any such tax shall have been paid (any such tax being payable by the holder of such Right Certificate at the time of surrender) or until it has been established to the Company's satisfaction that no such tax is due.

Section 10.  <u>Series A Preferred Stock Record Date</u>.  Each Person in whose name any certificate for shares of Series A Preferred Stock (or other securities, as the case may be) is issued upon the exercise of Rights shall for all purposes be deemed to have become the holder of record of the Series A Preferred Stock (or other securities, as the case may be) represented thereby on, and such certificate shall be dated, the date upon which the Right Certificate evidencing such rights was duly surrendered and payment of the aggregate Purchase Price therefor (and any applicable transfer taxes) was made.

Section 11.  <u>Adjustments to Number and Kind of Shares, Number of Rights or Purchase Price</u>.

The number and kind of shares subject to purchase upon the exercise of each Right, the number of Rights outstanding and the Purchase Price are subject to adjustment from time to time as provided in this Section 11.

(a) (i) In the event that the Company shall at any time after the Record Date (A) declare or pay any dividend on Series A Preferred Stock payable in shares of Series A Preferred Stock, (B) subdivide or split the outstanding shares of Series A

- 13 -

Preferred Stock into a greater number of shares, (C) combine or consolidate the outstanding shares of Series A Preferred Stock into a smaller number of shares or effect a reverse split of the outstanding shares of Series A Preferred Stock or (D) issue any shares of its capital stock in a reclassification of the Series A Preferred Stock (including any such reclassification in connection with a consolidation or merger in which the Company is the continuing or surviving corporation), except as otherwise provided in this Section 11(a), the Purchase Price in effect immediately prior to the time of the record date for such dividend or of the effective date of such subdivision, combination or reclassification, and the number and kind of shares of Series A Preferred Stock or capital stock, as the case may be, issuable upon exercise of a Right on such date, shall be proportionately adjusted so that the holder of any Right exercised after such time shall be entitled to receive, upon payment of an amount equal to (x) the Purchase Price in effect immediately prior to the record date or effective date of such dividend, subdivision, combination or reclassification, multiplied by (y) the number of one one-hundredths of a share of Series A Preferred Stock, or shares of capital stock, as the case may be, as to which a Right was exercisable immediately prior to such date, the aggregate number and kind of shares of Series A Preferred Stock or capital stock, as the case may be, which, if such Right had been exercised immediately prior to such date, the holder thereof would have owned upon such exercise and been entitled to receive, or would be deemed to have owned, by virtue of such dividend, subdivision, combination or reclassification.

(ii)     In the event that, at any time after the date of this Agreement, any Person, alone or together with its Affiliates and Associates, shall become an Acquiring Person, then, except as otherwise provided in this Section 11, each holder of a Right shall thereafter have the right to receive, upon exercise of a Right in accordance with the terms of this Rights Agreement and payment of the then current aggregate Purchase Price with respect to the total number of one one-hundredths of a share of Series A Preferred Stock for which a Right was exercisable immediately prior to the first occurrence of a Section 11(a)(ii) Event, in lieu of such number of one one-hundredths of a share of Series A Preferred Stock, such number of shares of Common Stock of the Company (such number of shares is herein called the "Adjustment Shares") as shall equal the result obtained by (x) multiplying the then current Purchase Price by the number of one one-hundredths of a share of Series A Preferred Stock for which a Right was exercisable immediately prior to the first occurrence of a Section 11(a)(ii) Event, and (y) dividing that product by 50% of the Current Market Price per share of Common Stock on the date of such first occurrence, provided that the number of Adjustment Shares shall be further appropriately adjusted to reflect any events of the type described in Sections 11(a)(i), (b) or (c) hereof occurring in respect of the Common Stock after the date of such first occurrence.  Notwithstanding anything in this Rights Agreement to the contrary, from and after the time (the "invalidation time") when any Person first becomes an Acquiring Person, any Rights that are beneficially owned by (x) such Acquiring Person (or any Associate or Affiliate of such Acquiring Person), (y) a transferee of such Acquiring Person (or any such Associate or Affiliate) who becomes a transferee after the invalidation time or (z) a transferee of such Acquiring Person (or any such Associate or Affiliate) who becomes a transferee prior to

- 14 -

or concurrently with the invalidation time pursuant to either (I) a transfer from the Acquiring Person to holders of its equity securities or to any Person with whom it has any continuing agreement, arrangement or understanding regarding the transferred Rights or (II) a transfer which the Board of Directors has determined is part of a plan, arrangement or understanding which has the purpose or effect of avoiding the provisions of this paragraph, and subsequent transferees of such Persons, shall be void without any further action and any holder of such Rights shall thereafter have no rights whatsoever with respect to such Rights under any provision of this Rights Agreement.  The Company shall use all reasonable effort to insure that the provisions of this Section 11(a)(ii) are complied with, but shall have no liability to any holder of Right Certificates or other Person as a result of its failure to make any determinations with respect to an Acquiring Person or its Affiliates, Associates or transferees hereunder.  From and after the invalidation time, no Right Certificate shall be issued pursuant to Section 3 or Section 6 hereof that represents Rights that are or have become void pursuant to the provisions of this paragraph, and any Right Certificate delivered to the Rights Agent that represents Rights that are or have become void pursuant to the provisions of this paragraph shall be canceled.

(iii)    In the event that the number of shares of Common Stock which are authorized by the Company's Certificate of Incorporation but not outstanding or reserved for issuance for purposes other than upon exercise of the Rights is not sufficient to permit the exercise in full of the Rights in accordance with Section 11(a)(ii) hereof and the rights shall become so exercisable, the Board of Directors shall, to the extent permitted by applicable law and any material agreements then in effect to which the Company is a party, (A) determine the excess of (1) the value of the Adjustment Shares issuable upon the exercise of a Right (the "Current Value"), over (2) the then current Purchase Price times the number of one one-hundredths of a share of Series A Preferred Stock for which a Right was exercisable immediately prior to the first occurrence of a Section 11(a)(ii) Event (such excess, the "Spread") and (B) with respect to each Right (other than Rights which have become void pursuant to Section 11(a)(ii) hereof), make adequate provision to substitute for any or all such Adjustment Shares (1) cash, (2) shares of Series A Preferred Stock or other equity securities of the Company (including, without limitation, shares, or units of shares, of preferred stock which, by virtue of having dividend, voting and liquidation rights substantially comparable to those of the Common Stock, are deemed in good faith by the Board of Directors to have substantially the same value as shares of Common Stock (such shares of Series A Preferred Stock and shares or units of shares of preferred stock are herein called "Common Stock equivalents")), (3) debt securities of the Company, (4) other assets, (5) a reduction of the Purchase Price, or (6) any combination of the foregoing, having a value which, when added to the value of the shares of Common Stock actually issued upon exercise of such Right, shall have an aggregate value equal to the Current Value, where such aggregate value has been determined in good faith by the Board of Directors based upon the advice of a nationally recognized independent investment banking firm selected in good faith by the Board of Directors; provided that if the Company shall not have made adequate provision to deliver value pursuant to clause (B) above within thirty days following the date (the "Section 11(a)(ii) Trigger Date") of the first occurrence

- 15 -

of a Section 11(a)(ii) Event, then the Company shall be obligated to deliver, to the extent permitted by applicable law and any material agreements then in effect to which the Company is a party, upon the surrender for exercise of a Right and without requiring payment of the Purchase Price, shares of Common Stock (to the extent available) and then, if necessary, shares of Series A Preferred Stock and then, if necessary, cash, which shares and cash have an aggregate value equal to the Spread.  If, upon the occurrence of a Section 11(a)(ii) Event, the number of shares of Common Stock that are authorized by the Company's Certificate of Incorporation but not outstanding or reserved for issuance for purposes other than upon exercise of the Rights are not sufficient to permit exercise in full of the Rights in accordance with Section 11(a)(ii) hereof, and if the Board of Directors shall determine in good faith that it is likely that sufficient additional shares of Common Stock could be authorized for issuance upon exercise in full of the Rights, then, if the Board of Directors so elects, the thirty (30) day period set forth above may be extended to the extent necessary, but not more than ninety (90) days after the Section 11(a)(ii) Trigger Date, in order that the Company may seek stockholder approval for the authorization of such additional shares (such thirty (30) day period, as it may be extended, is herein called the "Substitution Period").  To the extent that the Company determines that some action must be taken pursuant to the first or second sentence of this Section 11(a)(iii), the Company (x) shall provide, subject to Section 11(a)(ii) hereof and the last sentence of this Section 11(a)(iii), that such action shall apply uniformly to all outstanding Rights and (y) may suspend the exercisability of the Rights until the expiration of the Substitution Period in order to seek any authorization of additional shares and/or to decide the appropriate form of distribution to be made pursuant to such first sentence and to determine the value thereof.  In the event of any such suspension, the Company shall issue a public announcement stating that the exercisability of the Rights has been temporarily suspended, as well as a public announcement at such times as the suspension is no longer in effect. For purposes of this Section 11(a)(iii), the value of the Common Stock shall be the Current Market Price per share of the Common Stock on the Section 11(a)(ii) Trigger Date and the per share or per unit value of any "Common Stock equivalent" shall be deemed to equal the Current Market Price per share of the Common Stock on such date.  The Board of Directors may, but shall not be required to, establish procedures to allocate the right to receive Common Stock upon the exercise of the Rights among holders of Rights pursuant to this Section 11(a)(iii).

(b)     In case the Company shall fix a record date for the issuance of rights, options or warrants to all holders of Series A Preferred Stock entitling them to subscribe for or purchase (for a period expiring within forty-five calendar days after such record date) shares of Series A Preferred Stock, shares having the same rights, privileges and preferences as the Series A Preferred Stock ("equivalent Series A Preferred Stock") or securities convertible into Series A Preferred Stock or equivalent Series A Preferred Stock at a price per share of Series A Preferred Stock or equivalent Series A Preferred Stock (or having a conversion price per share, if a security convertible into Series A Preferred Stock or equivalent Series A Preferred Stock) less than the Current Market Price per share of Series A Preferred Stock on such record date, the Purchase Price to be in

effect after such record date shall be determined by multiplying the Purchase Price in effect immediately prior to such record date by a fraction, the numerator of which shall be the number of shares of Series A Preferred Stock outstanding on such record date, plus the number of shares of Series A Preferred Stock which the aggregate offering price of the total number of shares of Series A Preferred Stock and equivalent Series A Preferred Stock (and the aggregate initial conversion price of the convertible securities so to be offered, including the price required to be paid to purchase such convertible security) would purchase at such Current Market Price, and the denominator of which shall be the number of shares of Series A Preferred Stock outstanding on such record date, plus the number of additional shares of Series A Preferred Stock or equivalent Series A Preferred Stock to be offered for subscription or purchase (or into which the convertible securities so to be offered are initially convertible).  In case such subscription price may be paid by delivery of consideration part or all of which may be in a form other than cash, the value of such noncash consideration shall be as determined in good faith by the Board of Directors, whose determination shall be described in a statement filed with the Rights Agent.  Shares of Series A Preferred Stock owned by or held for the account of the Company shall not be deemed outstanding for the purpose of any such computation.  Such adjustment shall be made successively whenever such a record date is fixed, and in the event that such rights or warrants are not so issued, the Purchase Price shall be adjusted to be the Purchase Price which would then be in effect if such record date had not been fixed.

(c)     In case the Company shall fix a record date for a distribution to all holders of Series A Preferred Stock (including any such distribution made in connection with a consolidation or merger in which the Company is the continuing corporation) of evidences of indebtedness, cash (other than a regular quarterly cash dividend out of the earnings or retained earnings of the Company), assets (other than a dividend payable in Series A Preferred Stock, but including any dividend payable in stock other than Series A Preferred Stock) or subscription rights or warrants (excluding those referred to in Section 11(b) hereof), the Purchase Price to be in effect after such record date shall be determined by multiplying the Purchase Price in effect immediately prior to such record date by a fraction, the numerator of which shall be the Current Market Price per share of Series A Preferred Stock on such record date, less the fair market value (as determined in good faith by the Board of Directors of the Company, whose determination shall be described in a statement filed with the Rights Agent) of the portion of the cash, assets, evidences of indebtedness or stock so to be distributed or of such subscription rights or warrants applicable to a share of Series A Preferred Stock and the denominator of which shall be such Current Market Price per share of Series A Preferred Stock.  Such adjustments shall be made successively whenever such a record date is fixed, and in the event that such distribution is not so made, the Purchase Price shall be adjusted to be the Purchase Price which would have been in effect if such record date had not been fixed.

(d) (i)     For the purpose of any computation hereunder (including computations pursuant to Section 14 hereof), other than computations made pursuant to Section 11(a)(iii) hereof, the "Current Market Price" per share of Common Stock on any

- 17 -

date shall be deemed to be the average of the daily closing prices per share of such stock for the thirty consecutive Trading Days (as such term is hereinafter defined) immediately prior to such date, and for purpose of computations made pursuant to Section 11(a)(iii) hereof, the "Current Market Price" per share of Common Stock on any date shall be deemed to be the average of the daily closing prices per share of such stock for the ten consecutive Trading Days immediately following such date; provided, that in the event that the Current Market Price per share of Common Stock is determined during a period following the announcement by the issuer of such stock of (i) any dividend or distribution on such stock (other than a regular quarterly cash dividend) or (ii) any subdivision, combination or reclassification of the stock, and prior to the expiration of the requisite thirty Trading Day or ten Trading Day period, as set forth above, the exdividend date for such dividend or distribution, or the effective date of such subdivision, combination or reclassification, occurs, then, and in each such case, the Current Market Price shall be properly adjusted to take into account exdividend trading. The closing price for each day shall be the last sale price, regular way, or, in case no such sale takes place on such day, the average of the closing bid and asked prices, regular way, in either case as reported in the principal consolidated transaction reporting system with respect to securities listed or admitted to trading on the NYSE or, if the shares of Common Stock are not listed or admitted to trading on the NYSE, as reported in the principal consolidated transaction reporting system with respect to securities listed on the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, the last quoted sale price or, if not so quoted, the average of the high bid and low asked prices in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotations System ("NASDAQ") or such other system then in use, or, if on any such date the shares of Common Stock are not stated by any such organization, the average of the closing bid and asked prices as furnished by a professional market maker making a market in such stock selected by the Board of Directors. If on any such date no market maker is making a market in the Common Stock, the fair value of such shares on such date as determined in good faith by the Board of Directors shall be used. The term "Trading Day" shall mean a day on which the principal national securities exchange on which the shares of Common Stock are listed or admitted to trading is open for the transaction of business or, if the shares of Common Stock are not listed or admitted to trading on any national securities exchange, a Business Day. If the Common Stock is not publicly held or not so listed or traded, "Current Market Price" per share shall mean the fair value per share as determined in good faith by the Board of Directors, whose determination shall be described in a statement filed with the Rights Agent.

(ii)    For the purpose of any computation hereunder, the "Current Market Price" per share of Series A Preferred Stock shall be determined in the same manner as set forth above for the Common Stock in clause (i) of this Section 11(d) (other than the last sentence thereof). If the current market price per share of Series A Preferred Stock cannot be determined in the manner provided above or if the Series A Preferred

- 18 -

Stock is not publicly held or listed or traded in a manner described in clause (i) of this Section 11(d), the "Current Market Price" per share of Series A Preferred Stock shall be conclusively deemed to be an amount equal to ten thousand (as such number may be appropriately adjusted for such events as stock splits, stock dividends and recapitalization with respect to the Common Stock occurring after the date of this Agreement) multiplied by the current market price per share of the Common Stock. If neither the Common Stock nor the Series A Preferred Stock is publicly held or so listed or traded, "Current Market Price" per share of the Series A Preferred Stock shall mean the fair value per share as determined in good faith by the Board of Directors, which determination shall be described in a statement filed with the Rights Agent. For all purposes of this Rights Agreement, the "Current Market Price" of one one-hundredth of a share of Series A Preferred Stock shall be equal to the "Current Market Price" of one share of Series A Preferred Stock divided by ten thousand (subject to adjustment as provided above). The "Current Market Price" per share of equivalent Series A Preferred Stock shall be determined in the same manner as set forth above for the Series A Preferred Stock.

(e)    Anything herein to the contrary notwithstanding, no adjustment in the Purchase Price shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the Purchase Price, provided that any adjustments which by reason of this Section 11(e) are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations under this Section 11 shall be made to the nearest cent or to the nearest thousandth of a share, as the case may be. Notwithstanding the first sentence of this Section 11(e), any adjustment required by this Section 11 shall be made no later than the earlier of (i) three years from the date of the transaction which mandates such adjustment or (ii) one month prior to the Expiration Date.

(f)    If as a result of an adjustment made pursuant to Section 11(a) or Section 13(a) hereof, the holder of any Right thereafter exercised shall become entitled to receive any shares of capital stock other than Series A Preferred Stock, thereafter the number of such other shares so receivable upon exercise of any Right and the Purchase Price thereof shall be subject to adjustment from time to time in a manner and on terms as nearly equivalent as practicable to the applicable provisions with respect to the shares of Series A Preferred Stock contained in Sections 7, 9, 10, 11, 13 and 14 hereof, and such provisions shall apply on like terms to any such other shares.

(g)    All Rights originally issued by the Company subsequent to any adjustment made to the Purchase Price hereunder shall evidence the right to purchase, at the adjusted Purchase Price, the number of one one-hundredths of a share of Series A Preferred Stock purchasable from time to time hereunder upon exercise of the Rights, all subject to further adjustment as provided herein.

(h)    Unless the Company shall have exercised its election as provided in Section 11(i) hereof, upon each adjustment of the Purchase Price as a result of the

- 19 -

calculations made in Sections 11(b) and (c) hereof, each Right outstanding immediately prior to the making of such adjustment shall thereafter evidence the right to purchase, at the adjusted Purchase Price, that number of one one-hundredths of a share of Series A Preferred Stock (calculated to the nearest thousandth) obtained by (i) multiplying (x) the number of one one-hundredths of a share covered by a Right immediately prior to this adjustment by (y) the Purchase Price in effect immediately prior to such adjustment of the Purchase Price and (ii) dividing the product so obtained by the Purchase Price in effect immediately after such adjustment of the Purchase Price.

(i)    The Company may elect, on or after the date of any adjustment of the Purchase Price, to adjust the number of Rights in substitution for any adjustment in the number of one one-hundredths of a share of Series A Preferred Stock purchasable upon the exercise of a Right. Each of the Rights outstanding after the adjustment in the number of Rights shall be exercisable for the number of one one-hundredths of a share of Series A Preferred Stock for which a Right was exercisable immediately prior to such adjustment. Each Right held of record prior to such adjustment in the number of Rights shall become that number of Rights (calculated to the nearest thousandth) obtained by dividing the Purchase Price in effect immediately prior to adjustment of the Purchase Price by the Purchase Price in effect immediately after adjustment of the Purchase Price. The Company shall make a public announcement of its election to adjust the number of Rights, indicating the record date for the adjustment, and, if known at the time, the amount of the adjustment to be made. This record date may be the date on which the Purchase Price is adjusted or any day thereafter, but, if the Right Certificates have been issued, shall be at least ten (10) days later than the date of the public announcement. If Right Certificates have been issued, upon each adjustment of the number of Rights pursuant to this Section 11(i), the Company shall, as promptly as practicable, cause to be distributed to holders of record of Right Certificates on such record date Right Certificates evidencing, subject to Section 14 hereof, the additional Rights to which such holders shall be entitled as a result of such adjustment, or, at the option of the Company, shall cause to be distributed to such holders of record in substitution and replacement for the Right Certificates held by such holders prior to the date of adjustment, and upon surrender thereof, if required by the Company, new Right Certificates evidencing all the Rights to which such holders shall be entitled after such adjustment.    Right Certificates so to be distributed shall be issued, executed and countersigned in the manner provided for herein (and may bear, at the option of the Company, the adjusted Purchase Price) and shall be registered in the names of the holders of record of Right Certificates on the record date specified in the public announcement.

(j)    Irrespective of any adjustment or change in the Purchase Price or the number of one one-hundredths of a share of Series A Preferred Stock issuable upon the exercise of the Rights, the Right Certificates theretofore and thereafter issued may continue to express the Purchase Price and the number of one one-hundredths of a share which were expressed in the initial Right Certificates issued hereunder.

- 20 -

(k)    In any case in which this Section 11 shall require that an adjustment in the Purchase Price be made effective as of a record date for a specified event, the Company may elect to defer until the occurrence of such event the issuance to the holder of any Right exercised after such record date the shares of Series A Preferred Stock and cash, other capital stock or securities of the Company, if any, issuable upon such exercise over and above the shares of Series A Preferred Stock and cash, other capital stock or securities of the Company, if any, issuable upon such exercise on the basis of the Purchase Price in effect prior to such adjustment; provided, that the Company shall deliver to such holder a due bill or other appropriate instrument evidencing such holder's right to receive such additional shares of Series A Preferred Stock and cash, other capital stock or securities upon the occurrence of the event requiring such adjustment.

(l)    Anything in this Section 11 to the contrary notwithstanding, the Company shall be entitled to make such reductions in the Purchase Price, in addition to those adjustments expressly required by this Section 11, as and to the extent that in their good faith judgment the Board of Directors shall determine to be advisable in order that any (i) consolidation or subdivision of the Series A Preferred Stock, (ii) issuance for cash of any shares of Series A Preferred Stock at less than the current market price, (iii) issuance for cash of shares of Series A Preferred Stock or securities which by their terms are convertible into or exchangeable for shares of Series A Preferred Stock, (iv) stock dividends or (v) issuance of rights, options or warrants referred to in this Section 11, hereafter made by the Company shall not be taxable to holders of its Series A Preferred Stock.

(m)    The Company covenants and agrees that, after the earlier of the Distribution Date or the Stock Acquisition Date, it will not, except as permitted by Sections 23, 24 or 27 hereof, take (or permit any Subsidiary to take) any action if at the time such action is taken it is reasonably foreseeable that such action will diminish substantially or eliminate the benefits intended to be afforded by the Rights.

(n)    Anything in this Rights Agreement to the contrary notwithstanding, in the event that the Company shall at any time after the Record Date and prior to the Distribution Date (i) declare a dividend on the outstanding shares of Common Stock payable in shares of Common Stock, (ii) subdivide the outstanding shares of Common Stock, (iii) combine the outstanding shares of Common Stock into a smaller number of shares, or (iv) issue any shares of its capital stock in a reclassification of the outstanding Common Stock, the number of Rights associated with each share of Common Stock then outstanding, or issued or delivered thereafter, shall be proportionately adjusted so that the number of Rights thereafter associated with each share of Common Stock following any such event shall equal the result obtained by multiplying the number of Rights associated with each share of Common Stock immediately prior to such event by a fraction the numerator of which shall be the total number of shares of Common Stock outstanding immediately prior to the occurrence of the event and the denominator of which

- 21 -

shall be the total number of shares of Common Stock outstanding immediately following the occurrence of such event.

Section 12.   <u>Certification of Adjustments</u>.   Whenever an adjustment is made as provided in Sections 11 and 13 hereof, the Company shall (a) promptly prepare a certificate setting forth such adjustment and a brief statement of the facts giving rise to such adjustment, (b) promptly file with the Rights Agent and with each transfer agent for the Common Stock a copy of such certificate and (c) mail a brief summary thereof to each record holder of a Right (or, if prior to the Distribution Date, to each holder of Common Stock) in accordance with Section 26 hereof. Notwithstanding the foregoing sentence, the failure of the Company to give such notice shall not affect the validity of or the force or effect of or the requirement for such adjustment. The Rights Agent shall be fully protected in relying upon any certificate prepared by the Company pursuant to Sections 11 and 13 hereof and on any adjustment therein contained.

Section 13.   <u>Consolidation, Merger or Sale or Transfer of Assets or Earning Power</u>.

(a)     In the event that, following the time that any Person (alone or together with its Affiliates and Associates) first becomes an Acquiring Person, directly or indirectly (i) the Company shall consolidate with any Person or Persons or shall merge with and into any Person or Persons and the Company shall not be the surviving or continuing corporation of such merger, or (ii) any Person or Persons shall merge with and into the Company, and the Company shall be the continuing or surviving corporation of such merger and, in connection with such merger, all or part of the outstanding shares of Common Stock shall be changed into or exchanged for stock or other securities of any other Person or of the Company or cash or any other property, or (iii) the Company or one or more of its Subsidiaries shall sell or otherwise transfer to any Person or any Affiliate or Associate of such Person, in one or more transactions, assets or earning power aggregating more than 50% of the assets or earning power of the Company and its Sub-sidiaries (taken as a whole), then, on the first occurrence of any such event, proper provision shall be made so that (A) each holder of record of a Right (other than Rights which have become void pursuant to Section 11(a)(ii) hereof) shall thereafter have the right to receive, upon the exercise thereof and payment of the then current aggregate Purchase Price with respect to the total number of one one-hundredths of a share of Series A Preferred Stock for which a Right was exercisable immediately prior to the first occurrence of a Section 11(a)(ii) Event, such number of shares of validly issued, fully paid and non-assessable and freely tradeable Common Stock of the Principal Party (as defined herein) not subject to any liens, encumbrances, rights of first refusal or other adverse claims, as shall be equal to the result obtained by (1) multiplying the then current Purchase Price by the number of one one-hundredths of a share of Series A Preferred Stock for which a Right was exercisable immediately prior to the first occurrence of a Section 11(a)(ii) Event, and (2) dividing that product by 50% of the Current Market Price (determined as provided in Section 11(d) hereof with respect to the Common Stock) per share of the Common Stock

- 22 -

of such Principal Party on the date of consummation of such Section 13 Event, provided that the Purchase Price and the number of shares of Common Stock of such Principal Party issuable upon exercise of each Right shall be further adjusted as provided in Section 11(f) of this Rights Agreement to reflect any events occurring after the date of the first occurrence of a Section 13 Event, (B) such Principal Party shall thereafter be liable for, and shall assume, by virtue of such Section 13 Event, all the obligations and duties of the Company pursuant to this Rights Agreement, (C) the term "Company" for all purposes of this Rights Agreement shall thereafter be deemed to refer to such Principal Party, it being specifically intended that the provisions of Section 11 hereof shall apply only to such Principal Party following the first occurrence of a Section 13 Event, and (D) such Principal Party shall take such steps (including, but not limited to, the reservation of a sufficient number of shares of its Common Stock in accordance with Section 9 hereof) in connection with the consummation of any such transaction as may be necessary to assure that the provisions hereof shall thereafter be applicable, as nearly as reasonably may be, in relation to its shares of Common Stock thereafter deliverable upon the exercise of the Rights, provided that, upon the subsequent occurrence of any merger, consolidation, sale of all or substantially all of the assets, recapitalization, reclassification of shares, reorganization or other extraordinary transaction in respect of such Principal Party, each holder of a Right shall thereupon be entitled to receive, upon exercise of a Right and payment of the Purchase Price, such cash, shares, rights, warrants and other property which such holder would have been entitled to receive had he, at the time of such transaction, owned the shares of Common Stock of the Principal Party purchasable upon the exercise of a Right, and such Principal Party shall take such steps (including, but not limited to, reservation of shares of stock) as may be necessary to permit the subsequent exercise of the Rights in accordance with the terms hereof for such cash, shares, rights, warrants and other property.

(b)      "Principal Party" shall mean

(i)      in the case of any transaction described in (i) or (ii) of the first sentence of Section 13(a) hereof:  (A) the Person that is the issuer of the securities into which shares of Common Stock of the Company are converted in such merger or consolidation, or, if there is more than one such issuer, the issuer the Common Stock of which has the greatest aggregate market value of shares outstanding or (B) if no securities are so issued, (x) the Person that is the other party to the merger, if such Person survives said merger, or, if there is more than one such Person, the Person the Common Stock of which has the greatest aggregate market value of shares outstanding or (y) if the Person that is the other party to the merger does not survive the merger, the Person that does survive the merger (including the Company if it survives) or (z) the Person resulting from the consolidation; and

(ii)      in the case of any transaction described in (iii) of the first sentence in Section 13(a) hereof, the Person that is the party receiving the greatest portion of the assets or earning power transferred pursuant to such transaction or transactions, or,

- 23 -

if each Person that is a party to such transaction or transactions receives the same portion of the assets or earning power so transferred or if the Person receiving the greatest portion of the assets or earning power cannot be determined, whichever of such Persons as is the issuer of Common Stock having the greatest aggregate market value of shares outstanding;

provided, however, that in any such case described in the foregoing clause (b)(i) or (b)(ii), (1) if the Common Stock of such Person is not at such time or has not been continuously over the preceding 12-month period registered under Section 12 of the Exchange Act, and if such Person is a direct or indirect Subsidiary of another Person the Common Stock of which is and has been so registered, the term "Principal Party" shall refer to such other Person, or (2) if such Person is a Subsidiary, directly or indirectly, of more than one Person, the Common Stocks of all of which are and have been so registered, the term "Principal Party" shall refer to whichever of such Persons is the issuer of the Common Stock having the greatest aggregate market value of shares outstanding, or (3) if such Person is owned, directly or indirectly, by a joint venture formed by two or more Persons that are not owned, directly or indirectly, by the same Person, the rules set forth in clauses (1) and (2) above shall apply to each of the owners having an interest in the venture as if the Person owned by the joint venture was a Subsidiary of both or all of such joint venturers, and the Principal Party in each such case shall bear the obligations set forth in this Section 13 in the same ratio as its interest in such Person bears to the total of such interests.

(c)     The Company shall not consummate any consolidation, merger, sale or transfer referred to in Section 13(a) hereof unless prior thereto the Company and the Principal Party involved therein shall have executed and delivered to the Rights Agent an agreement confirming that the requirements of Sections 13(a) and (b) hereof shall promptly be performed in accordance with their terms and that such consolidation, merger, sale or transfer of assets shall not result in a default by the Principal Party under this Rights Agreement as the same shall have been assumed by the Principal Party pursuant to Sections 13(a) and (b) hereof and providing that, as soon as practicable after executing such agreement pursuant to this Section 13, the Principal Party will:

(i)     prepare and file a registration statement under the Securities Act, if necessary, with respect to the Rights and the securities purchasable upon exercise of the Rights on an appropriate form, use its best efforts to cause such registration statement to become effective as soon as practicable after such filing and use its best efforts to cause such registration statement to remain effective (with a prospectus at all times meeting the requirements of the Securities Act) until the Expiration Date, and similarly comply with applicable state securities laws;

(ii)     use its best efforts, if the Common Stock of the Principal Party shall be listed on a national securities exchange, to list (or continue the listing of) the Rights and the securities purchasable upon exercise of the Rights on such securities exchange and, if the Common Stock of the Principal Party shall not be listed on a national

- 24 -

securities exchange, to cause the Rights and the securities purchasable upon exercise of the Rights to be reported by NASDAQ or such other system then in use;

(iii)    deliver to holders of the Rights historical financial statements for the Principal Party which comply in all respects with the requirements for registration on Form 10 (or any successor form) under the Exchange Act; and

(iv)    obtain waivers of any rights of first refusal or preemptive rights in respect of the shares of Common Stock of the Principal Party subject to purchase upon exercise of outstanding Rights.

In the event that any of the transactions described in Section 13(a) hereof shall occur, the Rights which have not theretofore been exercised pursuant to either Section 7 or Section 11(a)(ii) hereof shall thereafter be exercisable only in the manner described in Section 13(a) hereof.

(d)    Furthermore, in case the Principal Party which is to be a party to a transaction referred to in this Section 13 has provision in any of its authorized securities or in its Certificate of Incorporation or By-laws or other instrument governing its corporate affairs, which provision would have the effect of (i) causing such Principal Party to issue (other than to holders of Rights pursuant to this Section 13), in connection with, or as a consequence of, the consummation of a transaction referred to in this Section 13, shares of Common Stock of such Principal Party at less than the then Current Market Price per share (determined pursuant to Section 11(d) hereof) or securities exercisable for, or convertible into, Common Stock of such Principal Party at less than such then Current Market Price, or (ii) providing for any special payment, tax or similar provisions in connection with the issuance of the Common Stock of such Principal Party pursuant to the provisions of Section 13, then, in such event, the Company hereby agrees with each holder of Rights that it shall not consummate any such transaction unless prior thereto the Company and such Principal Party shall have executed and delivered to the Rights Agent a supplemental agreement providing that the provision in question of such Principal Party shall have been canceled, waived or amended, or that the authorized securities shall be redeemed, so that the applicable provision will have no effect in connection with, or as a consequence of, the consummation of the proposed transaction.

(e)    The Company covenants and agrees that it shall not, at any time after the occurrence of a Section 11(a)(ii) Event, enter into any transaction of the type contemplated by (i) - (iii) of Section 13(a) hereof if (x) at the time of or immediately after such consolidation, merger, sale or other transaction there are any rights, warrants or other instruments or securities outstanding or agreements in effect which would substantially diminish or otherwise eliminate the benefits intended to be afforded by the Rights, (y) prior to, simultaneously with or immediately after such consolidation, merger, sale or other transaction, the stockholders of the Person who constitutes, or would constitute, the "Principal Party" for purposes of Section 13(a) hereof shall have received a distribution of

- 25 -

Rights previously owned by such Person or any of its Affiliates and Associates or (z) the form or nature of organization of the Principal Party would preclude or limit the exercisability of the Rights.

Section 14.    Fractional Rights and Fractional Shares.

(a)    The Company shall not be required to issue fractions of Rights or to distribute Right Certificates which evidence fractional Rights. If the Company shall not issue fractions of Rights, in lieu of such fractional Rights, there shall be paid to the holders of record of the Right Certificates with regard to which such fractional Rights would otherwise be issuable an amount in cash equal to the same fraction of the then current market value of a whole Right. For the purposes of this Section 14(a), the then current market value of a Right shall be the closing price of the Rights for the Trading Day immediately prior to the date on which fractional Rights would have been issuable, determined in the same manner as the closing price of a share of Common Stock shall be determined pursuant to Section 11(d) hereof.

(b)    The Company shall not be required to issue fractions of shares of Series A Preferred Stock or other securities of the Company upon exercise of the Rights (other than fractions of shares of Series A Preferred Stock which are integral multiples of one one-hundredth of a share) or to distribute certificates which evidence interests in fractional shares (other than fractions of shares of Series A Preferred Stock which are integral multiples of one one-hundredth of a share); provided that in lieu of issuing fractions of shares of Series A Preferred Stock, the Company may, at its election, issue depository receipts evidencing interests in fractions of shares pursuant to an appropriate agreement between the Company and a depository selected by it, but only if such agreement shall provide that the holders of such depository receipts shall have all of the rights, privileges and preferences to which they would be entitled as beneficial owners of the Series A Preferred Stock. With respect to fractional shares that are not integral multiples of one one-hundredth of a share, if the Company does not issue such fractional shares or depository receipts in lieu thereof, there shall be paid to the holders of record of Right Certificates at the time such Right Certificates are exercised as herein provided an amount in cash equal to the same fraction of the then current market value of a share of Series A Preferred Stock or other securities of the Company. For purposes of this Section 14(b), the then current market value of a share of Series A Preferred Stock or other securities of the Company shall be the closing price thereof for the Trading Day immediately prior to the date of such exercise, as determined pursuant to Section 11(d) hereof or in the same manner as the closing price of a share of Series A Preferred Stock shall be determined pursuant to Section 11(d)(ii) hereof, as the case may be.

(c)    Following the occurrence of a Triggering Event, the Company shall not be required to issue fractions of shares of Common Stock upon exercise of the Rights or to distribute certificates which evidence fractional shares of Common Stock. In lieu of fractional shares of Common Stock, the Company may pay to the registered holders

- 26 -

of Rights Certificates at the time such Rights are exercised as herein provided an amount in cash equal to the same fraction of the current market value of one share of Common Stock. For purposes of this Section 14(c), the current market value of one share of Common Stock shall be the closing price of one share of Common Stock (as determined pursuant to Section 11(d)(i) hereof) for the Trading Day immediately prior to the date of such exercise.

(d)    The holder of a Right by the acceptance of a Right expressly waives his right to receive any fractional Right or any fractional shares of Series A Preferred Stock or other securities of the Company upon exercise of a Right, except as provided by this Section 14.

Section 15.    Rights of Action.    All rights of action in respect of this Rights Agreement are vested in the respective holders of record of the Rights Certificates (and, prior to the Distribution Date, the holders of record of the Common Stock); and any holder of record of any Right Certificate (or, prior to the Distribution Date, of the Common Stock), without the consent of the Rights Agent or of the holder of any other Right Certificate (or, prior to the Distribution Date, of the Common Stock), may, in his own behalf and for his own benefit, enforce, and may institute and maintain any suit, action or proceeding against the Company or any other Person to enforce, or otherwise act in respect of, his right to exercise the Rights evidenced by such Right Certificate in the manner provided in such Right Certificate and in this Rights Agreement. Without limiting the foregoing or any remedies available to the holders of Rights, it is specifically acknowledged that the holders of Rights would not have an adequate remedy at law for any breach of this Rights Agreement and, accordingly, that they will be entitled to specific performance of the obligations under, and injunctive relief against actual or threatened violations of, the obligations of any Person subject to this Rights Agreement.

Section 16.    Agreement of Right Holders.    Every holder of a Right by accepting the same consents and agrees with the Company and the Rights Agent and with every other holder of a Right that:

(a)    prior to the Distribution Date, the Rights will not be evidenced by a Right Certificate and will be transferable only in connection with the transfer of Common Stock;

(b)    after the Distribution Date, the Right Certificates will be transferable only on the registry books of the Rights Agent if surrendered at the designated office of the Rights Agent, duly endorsed or accompanied by a proper instrument of transfer;

(c)    the Company and the Rights Agent may deem and treat the person in whose name the Right Certificate (or, prior to the Distribution Date, the associated Common Stock certificate) is registered as the absolute owner thereof and of the

- 27 -

Rights evidenced thereby (notwithstanding any notations of ownership or writing on the Right Certificate or the associated Common Stock certificate made by anyone other than the Company or the Rights Agent or the transfer agent of the Common Stock) for all purposes whatsoever, and neither the Company nor the Rights Agent shall be affected by any notice to the contrary; and

(d)    notwithstanding anything in this Rights Agreement to the contrary, neither the Company nor the Rights Agent shall have any liability to any holder of a Right or other Person as a result of its inability to perform any of its obligations under this Rights Agreement by reason of any preliminary or permanent injunction or other order, decree or ruling issued by a court of competent jurisdiction or by a governmental, regulatory or administrative agency or commission, or any statute, rule, regulation or executive order promulgated or enacted by any governmental authority, prohibiting or otherwise restraining performance of such obligation, provided that the Company must use its best efforts to have any such order, decree or ruling lifted or otherwise overturned as soon as possible.

Section 17.  Right Certificate Holder Not Deemed a Stockholder.

No holder of a Right, as such, shall be entitled to vote, receive dividends in respect of or be deemed for any purpose to be the holder of Series A Preferred Stock or any other securities of the Company which may at any time be issuable upon the exercise of the Rights, nor shall anything contained herein or in any Right Certificate be construed to confer upon the holder of any Right Certificate, as such, any of the rights of a stockholder of the Company or any right to vote for the election of directors or upon any matter submitted to stockholders at any meeting thereof, or to give or withhold consent to any corporate action, or to receive notice of meetings or other actions affecting stockholders, or to receive dividends or subscription rights in respect of any such stock or securities, or otherwise, until the Right or Rights evidenced by such Right Certificate shall have been exercised in accordance with the provisions hereof.

Section 18.  Concerning the Rights Agent.

(a)    The Company agrees to pay to the Rights Agent reasonable compensation for all services rendered by it hereunder and, from time to time, on demand of the Rights Agent, its reasonable expenses and counsel fees and other disbursements incurred in the administration and execution of this Rights Agreement and the exercise and performance of its duties hereunder.  The Company also agrees to indemnify the Rights Agent for, and to hold it harmless against, any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of the Rights Agent for anything done or omitted to be done by the Rights Agent in connection with the acceptance and administration of this Rights Agreement, including the cost and expenses of defending against any claim of liability in the premises.

- 28 -

(b)     The Rights Agent shall be protected and shall incur no liability for or in respect of any action taken, suffered or omitted by it in connection with its administration of this Rights Agreement in reliance upon any Right Certificate, certificate for Series A Preferred Stock or other securities of the Company, instrument of assignment or transfer, power of attorney, endorsement, affidavit, letter, notice, direction, consent, certificate, statement or other paper or document believed by it to be genuine and to be signed, executed and, where necessary, guaranteed, verified or acknowledged, by the proper Person or Persons.

Section 19.   <u>Merger or Consolidation or Change of Name of Rights Agent</u>.

(a)     Any corporation into which the Rights Agent or any successor Rights Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Rights Agent or any successor Rights Agent shall be a party, or any corporation succeeding to the corporate trust or stock transfer business of the Rights Agent or any successor Rights Agent, shall be the successor to the Rights Agent under this Rights Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto, provided that such corporation would be eligible for appointment as a successor Rights Agent under the provisions of Section 21 hereof.   In case at the time such successor Rights Agent shall succeed to the agency created by this Rights Agreement, any of the Right Certificates shall have been countersigned but not delivered, any such successor Rights Agent may adopt the countersignature of the predecessor Rights Agent and deliver such Right Certificates so countersigned, and in case at that time any of the Right Certificates shall not have been countersigned, any successor Rights Agent may countersign such Right Certificates either in the name of the predecessor Rights Agent or in the name of the successor Rights Agent, and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Rights Agreement.

(b)     In case at any time the name of the Rights Agent shall be changed and at such time any of the Right Certificates shall have been countersigned but not delivered, the Rights Agent may adopt the countersignature under its prior name and deliver such Right Certificates so countersigned; and in case at that time any of the Right Certificates shall not have been countersigned, the Rights Agent may countersign such Right Certificates either in its prior name or in its changed name; and in all such cases such Right Certificates shall have the full force provided in the Right Certificates and in this Rights Agreement.

Section 20.   <u>Duties of Rights Agent</u>.   The Rights Agent undertakes the duties and obligations imposed by this Rights Agreement upon the following terms and conditions, by all of which the Company and the holders of Right Certificates, by their acceptance thereof, shall be bound:

(a)     The Rights Agent may consult with legal counsel (who may be legal counsel for the Company), and the opinion of such counsel shall be full and complete

- 29 -

authorization and protection to the Rights Agent as to any action taken or omitted to be taken by it in good faith and in accordance with such opinion.

(b)     Whenever in the performance of its duties under this Rights Agreement the Rights Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering to be taken any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by the Chairman of the Board, the Chief Executive Officer, any Executive Vice President, any Senior Vice President, the Treasurer or any Assistant Treasurer or the Secretary or any Assistant Secretary of the Company and delivered to the Rights Agent, and such certificate shall be full authorization to the Rights Agent for any action taken or suffered to be taken in good faith by it under the provisions of this Rights Agreement in reliance upon such certificate.

(c)     The Rights Agent shall be liable hereunder only for its own negligence, bad faith or willful misconduct.

(d)     The Rights Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Rights Agreement or in the Right Certificates (except its countersignature thereof) or be required to verify the same, but all such statements and recitals are and shall be deemed to have been made by the Company only.

(e)     The Rights Agent shall not (i) be responsible for (A) the validity of this Rights Agreement or the execution and delivery hereof (except the due execution hereof by the Rights Agent) or the validity or execution of any Right Certificate (except its countersignature thereof), (B) any breach by the Company of any covenant or condition contained in this Rights Agreement or in any Right Certificate, (C) any adjustment required under the provisions of Section 11 or 13 hereof or (D) the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment (except with respect to the exercise of Rights evidenced by Right Certificates after actual notice of any such adjustment) or (ii) by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Series A Preferred Stock to be issued pursuant to this Rights Agreement or any Right Certificate or as to whether any shares of Series A Preferred Stock will, when issued, be validly authorized and issued, fully paid and nonassessable.

(f)     The Company agrees that it will perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Rights Agent for the carrying out or performing by the Rights Agent of the provisions of this Rights Agreement.

- 30 -

(g)     The Rights Agent is hereby authorized and directed to accept instructions with respect to the performance of its duties hereunder from the Chairman of the Board, the Chief Executive Officer, any Executive Vice President, any Senior Vice President, the Secretary or any Assistant Secretary or the Treasurer or any Assistant Treasurer of the Company, and to apply to such officers for advice or instructions in connection with its duties, and it shall not be liable for and action taken or suffered to be taken by it in good faith in accordance with instructions of any such officer.

(h)     The Rights Agent and any stockholder, director, officer or employee of the Rights Agent may buy, sell or deal in any of the Rights or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not the Rights Agent under this Rights Agreement.  Nothing herein shall preclude the Rights Agent from acting in any other capacity for the Company or for any other entity.

(i)     The Rights Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents, and the Rights Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys or agents or for any loss to the Company resulting from any such act, default, neglect or misconduct, provided reasonable care was exercised in the selection and continued employment thereof.

(j)     If, with respect to any Rights Certificate surrendered to the Rights Agent for exercise or transfer, the certificate contained in the form of assignment or the form of election to purchase set forth on the reverse thereof, as the case may be, has either not been completed or indicates an affirmative response to clause 1 or 2 thereof, the Rights Agent shall not take any further action with respect to such requested exercise of transfer without first consulting with the Company.

Section 21.   Change of Rights Agent.   The Rights Agent or any successor Rights Agent may resign and be discharged from its duties under this Rights Agreement upon thirty days' notice in writing mailed to the Company and to each transfer agent of the Common Stock by registered or certified mail, and to the holders of the Right Certificates by first-class mail.   The Company may remove the Rights Agent or any successor Rights Agent (with or without cause) upon thirty days' notice in writing, mailed to the Rights Agent or successor Rights Agent, as the case may be, and to each transfer agent of the Common Stock by registered or certified mail, and to the holders of the Right Certificates by first-class mail.   If the Rights Agent shall resign or be removed or shall otherwise become incapable of acting, the Company shall appoint a successor to the Rights Agent.   Notwithstanding the foregoing provisions of this Section 21, in no event shall the resignation or removal of a Rights Agent be effective until a successor Rights Agent shall have been appointed and have accepted such appointment.   If the Company shall fail to make such appointment within a period of thirty days after such removal or after it has

- 31 -

been notified in writing of such resignation or incapacity by the resigning or incapacitated Rights Agent or by the holder of a Right Certificate (who shall, with such notice, submit his Right Certificate for inspection by the Company), then the incumbent Rights Agent or the holder of record of any Right Certificate may apply to any court of competent jurisdiction for the appointment of a new Rights Agent. Any successor Rights Agent, whether appointed by the Company or by such a court, shall be (a) a corporation organized and doing business under the laws of the United States or any State thereof, in good standing, which is authorized under such laws to exercise corporate trust or stock transfer powers and is subject to supervision or examination by federal or state authority and which has at the time of its appointment as Rights Agent a combined capital and surplus of at least $50,000,000 or (b) an Affiliate controlled by a corporation described in clause (a) of this sentence. After appointment, the successor Rights Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Rights Agent without further act or deed, but the predecessor Rights Agent shall deliver and transfer to the successor Rights Agent any property at the time held by it hereunder, and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose. Not later than the effective date of any such appointment the Company shall file notice thereof in writing with the predecessor Rights Agent and each transfer agent of the Common Stock, and mail a notice thereof in writing to the registered holders of the Right Certificates. Failure to give any notice provided for in this Section 21, however, or any defect therein, shall not affect the legality or validity of the resignation or removal of the Rights Agent or the appointment of the successor Rights Agent, as the case may be.

Section 22. <u>Issuance of New Right Certificates</u>. Notwithstanding any of the provisions of this Rights Agreement to the contrary, the Company may, at its option, issue new Right Certificates evidencing Rights in such form as may be approved by the Board of Directors to reflect any adjustment or change in the Purchase Price and the number or kind or class of shares of stock or other securities or property purchasable under the Right Certificates made in accordance with the provisions of this Rights Agreement. In addition, in connection with the issuance or sale of shares of Common Stock following the Distribution Date and prior to the occurrence of a Triggering Event or the redemption or expiration of the Rights, the Company may, with respect to shares of Common Stock so issued or sold pursuant to the exercise of employee stock options or under any employee plan or arrangement, or upon the exercise, conversion or exchange of securities hereafter issued by the Company, or in any other case, if deemed necessary or appropriate by the Board of Directors, issue Right Certificates representing the appropriate number of Rights in connection with such issuance or sale, provided that (i) no such Right Certificate shall be issued if, and to the extent that, the Company shall be advised by counsel that such issuance would create a significant risk of material adverse tax consequences to the Company or the Person to whom such Rights Certificate would be issued, and (ii) no such Rights Certificate shall be issued if, and to the extent that, appropriate adjustment shall otherwise have been made in lieu of the issuance thereof.

Section 23.  Redemption.

(a)     The Board of Directors may, at its option, at any time prior to the earlier of (i) the first occurrence of a Section 11(a)(ii) Event, and (ii) the close of business on the Final Expiration Date, cause the Company to redeem all but not less than all of the then outstanding Rights at a redemption price of $0.01 per Right, as such amount may be appropriately adjusted to reflect any stock split, stock dividend or similar transaction occurring after the date hereof (such redemption price being hereinafter referred to as the "Redemption Price").

(b)     Immediately upon the effective time of the redemption of the Rights as specified by the action of the Board of Directors ordering the redemption of the Rights, and without any further action and without any notice, the right to exercise the Rights will terminate and the only right thereafter of the holders of Rights shall be to receive the Redemption Price, without any interest thereon.  Promptly after the effective time of the redemption of the Rights as specified by the action of the Board of Directors ordering the redemption of the Rights, the Company shall give notice of such redemption to the holders of the then outstanding Rights by mailing such notice to all such holders at their last addresses as they appear upon the registry books of the Rights Agent or, prior to the Distribution Date, on the registry books of the transfer agent of the Common Stock. Any notice which is mailed in the manner provided herein shall be deemed given, whether or not the holder receives the notice.  Each such notice of redemption will state the effective time of the redemption, the method by which the payment of the Redemption Price will be made and the time for such payment.  The failure to give notice required by this Section 23(b) or any defect therein shall not affect the legality or validity of the action taken by the Company.

Section 24.  Exchange.

(a)     The Board of Directors may, at its option, at any time after the first occurrence of a Section 11(a)(ii) Event, exchange all or part of the then outstanding and exercisable Rights (which shall not include Rights that have become void pursuant to the provisions of Section 11(a)(ii) hereof) for shares of Common Stock at an exchange ratio of one share of Common Stock per Right (such exchange ratio being hereinafter referred to as the "Exchange Ratio").  Notwithstanding the foregoing, the Board of Directors shall not be empowered to effect such exchange at any time after any Person (other than an Exempt Person), together with all Affiliates and Associates of such Person, becomes the Beneficial Owner of 50% or more of the Common Stock then outstanding.

(b)     Immediately upon the effective time of the exchange of the Rights as specified by the action of the Board of Directors ordering the exchange of any Rights pursuant to Section 24(a) and without any further action and without any notice, the right to exercise such Rights shall terminate and the only right thereafter of a holder of such Rights shall be to receive that number of shares of Common Stock equal to the number of

- 33 -

such Rights held by such holder multiplied by the Exchange Ratio. The Company shall promptly give public notice of any such exchange; provided, however, that the failure to give, or any defect in, such notice shall not affect the validity of such exchange. The Company promptly shall mail a notice of any such exchange to all of the holders of such Rights at their last addresses as they appear upon the registry books of the Rights Agent. Any notice which is mailed in the manner herein provided shall be deemed given, whether or not the holder receives the notice. Each such notice of exchange will state the method by which the exchange of shares of Common Stock for Rights will be effected and, in the event of any partial exchange, the number of Rights which will be exchanged. Any partial exchange shall be effected pro rata based on the number of Rights (other than Rights which have become void pursuant to the provisions of Section 11(a)(ii) hereof) held by each holder of Rights.

        (c)     In the event that there shall not be sufficient shares of Common Stock issued but not outstanding or authorized but unissued to permit any exchange of Rights as contemplated by this Section 24, the Company shall take all such action as may be necessary to authorize additional shares of Common Stock for issuance upon exchange of the Rights. In the event that the Company shall, after good faith effort, be unable to take all such action as may be necessary to authorize such additional shares of Common Stock, the Company shall substitute, for each share of Common Stock that would otherwise be issuable upon exchange of Right, a number of shares (or fractions thereof) of Series A Preferred Stock (or equivalent Series A Preferred Stock, as such term is defined in Section 11(b) hereof), having an aggregate Current Market Price equal to the Current Market Price per share of Common Stock as of the date of issuance of such shares (or a fraction thereof) of Series A Preferred Stock (or equivalent Series A Preferred Stock).

        (d)     In any exchange pursuant to Section 24(a), the Company shall not be required to issue fractions of shares of Common Stock or to distribute certificates which evidence fractional shares of Common Stock. In lieu of such fractional shares of Common Stock, the Company shall pay to the registered holders of the Right Certificates with regard to which such fractional shares of Common Stock would otherwise be issuable an amount in cash equal to the same fraction of the current market value of a whole share of Common Stock. For the purposes of this Section 24(d), the current market value of a whole share of Common Stock shall be the Current Market Price of a share of Common Stock (as determined pursuant to the second sentence of Section 11(d)(i) hereof) for the Trading Day immediately prior to the date of exchange pursuant to Section 24(a) hereof.

Section 25.   <u>Notice of Proposed Actions</u>.

        (a)     In case the Company, after the earlier of the Distribution Date or the Stock Acquisition Date, shall propose (i) to effect any of the transactions referred to in Section 11(a)(i) hereof or to pay any dividend to the holders of record of its Series A Preferred Stock payable in stock of any class or to make any other distribution to the holders of record of its Series A Preferred Stock (other than a regular quarterly cash

dividend), or (ii) to offer to the holders of record of its Series A Preferred Stock options, warrants, or other rights to subscribe for or to purchase shares of Series A Preferred Stock (including any security convertible into or exchangeable for Series A Preferred Stock) or shares of stock of any class or any other securities, options, warrants, convertible or exchangeable securities or other rights, or (iii) to effect any reclassification of its Series A Preferred Stock or any recapitalization or reorganization of the Company, or (iv) to effect the liquidation, dissolution or winding up of the Company, then, in each such case, the Company shall give to each holder of record of a Right Certificate, in accordance with Section 26 hereof, notice of such proposed action, which shall specify the record date for the purposes of such transaction referred to in Section 11(a)(i), or such dividend or distribution, or the date on which such reclassification, recapitalization, reorganization, liquidation, dissolution or winding up is to take place and the record date for determining participation therein by the holders of record of Series A Preferred Stock, if any such date is to be fixed, and such notice shall be so given in the case of any action covered by clause (i) or (ii) above at least ten (10) days prior to the record date for determining holders of record of Series A Preferred Stock for purposes of such action, and in the case of any such other action, at least ten (10) days prior to the date of the taking of such proposed action or the date of participation therein by the holders of record of Series A Preferred Stock, whichever shall be the earlier. The failure to give notice required by this Section 25 or any defect therein shall not affect the legality or validity of the action taken by the Company or the vote upon any such action.

(b)    In case the event set forth in Section 11(a)(ii) hereof shall occur, then the Company shall, as soon as practical thereafter, give to each holder of Rights, in accordance with Section 26 hereof, a notice of the occurrence of such event, which notice shall describe such event and the consequences of such event to the holders of Rights under Section 11(a)(ii) hereof.

(c)    In case any of the transactions referred to in Section 13 of this Rights Agreement are proposed, then, in any such case, (i) the Company shall give to each holder of Rights, in accordance with Section 26 hereof, notice of the proposal of such transaction at least ten (10) days prior to consummating such transaction, which notice shall specify the proposed event and the consequences of the event to holders of Rights under Section 13 hereof, and, upon consummating such transaction, shall similarly give notice thereof to each holder of Rights and (ii) all references in the preceding paragraph (a) to Series A Preferred Stock shall be deemed thereafter to refer to Common Stock or other securities of the Principal Party, as appropriate.

Section 26.    Notices.    Notices or demands authorized by this Rights Agreement to be given or made by the Rights Agent or by the holder of record of any Right Certificate or Right to or on behalf of the Company shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Rights Agent) as follows:

- 35 -

Assix International, Inc.
505 E. Jackson Street, Suite 220
Tampa, FL 33502
Attn: Secretary

Subject to the provisions of Section 21 hereof, any notice or demand authorized by this Rights Agreement to be given or made by the Company or by the holder of record of any Right Certificate or Right to or on the Rights Agent shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed (until another address is filed in writing with the Company) as follows:

Registrar and Transfer Company
10 Commerce Drive
Cranford, NJ 07016
Attn: William Tatler, Vice President

Notices or demands authorized by this Rights Agreement to be given or made by the Company or the Rights Agent to the holder of record of any Right Certificate or Right shall be sufficiently given or made if sent by first-class mail, postage prepaid, addressed to such holder at the address of such holder as it appears upon the registry books of the Rights Agent or, prior to the Distribution Date, on the registry books of the Transfer Agent.

Section 27.  <u>Supplements and Amendments</u>. For as long as the Rights are then redeemable, and except as provided in the last sentence of this Section 27, the Company may, in its sole and absolute discretion, and the Rights Agent shall, if the Company so directs, supplement or amend any provision of this Agreement in any respect without the approval of any holders of the Rights or the Common Stock. At any time when the Rights are not then redeemable, and except as provided in the last sentence of this Section 27, the Company may, and the Rights Agent shall if the Company so directs, supplement or amend this Agreement without the approval of any holders of Rights Certificates in order (a) to cure any ambiguity, (b) to correct or supplement any provision contained herein which may be defective or inconsistent with any other provisions herein or (c) to change or supplement the provisions hereunder in any manner which the Company may deem necessary or desirable; provided, that no such supplement or amendment shall adversely affect the interests of the holders of Right Certificates as such; and provided, further, that this Rights Agreement may not be so supplemented or amended to (i) lengthen a time period relating to when the Rights may be redeemed or this Agreement amended at the sole and absolute discretion of the Company at such time as the Rights are not then redeemable or (ii) to lengthen or shorten any other time period unless such lengthening or shortening of such other time period is for the purpose of protecting, enhancing or clarifying the rights of, or the benefits to, the holders of Rights as such (other than any Acquiring Person or an Affiliate or Associate of such an Acquiring Person). Upon the delivery of a certificate from an appropriate officer of the Company which states that the

- 36 -

proposed supplement or amendment is in compliance with the terms of this Section 27, the Rights Agent shall execute such supplement or amendment. Notwithstanding anything contained in this Rights Agreement to the contrary, no supplement or amendment shall be made which changes the Redemption Price or the Final Expiration Date.

Section 28. <u>Successors</u>. All of the covenants and provisions of this Rights Agreement by or for the benefit of the Company or the Rights Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 29. <u>Benefits of this Rights Agreement</u>. Nothing in this Rights Agreement shall be construed to give to any person or corporation other than the Company, the Rights Agent and the registered holders of the Right Certificates (and, prior to the Distribution Date, the Common Stock) any legal or equitable right, remedy or claim under this Rights Agreement, and this Rights Agreement shall be for the sole and exclusive benefit of the Company, the Rights Agent and the holders of record of the Right Certificates (and, prior to the Distribution Date, the Common Stock).

Section 30. <u>Delaware Contract</u>. This Rights Agreement and each Right Certificate issued hereunder shall be deemed to be a contract made under the laws of the State of Delaware and for all purposes shall be governed by and construed in accordance with the laws of such state applicable to contracts to be made and performed entirely within such state.

Section 31. <u>Counterparts</u>. This Rights Agreement may be executed in any number of counterparts, each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 32. <u>Descriptive Headings</u>. Descriptive headings of the several sections of this Rights Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 33. <u>Severability</u>. If any term, provision, covenant or restriction of this Rights Agreement is held by a court of competent jurisdiction or other authority to be invalid, illegal, or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Rights Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

IN WITNESS WHEREOF, the parties hereto have caused this Rights Agreement to be duly executed, all as of the day and year first above written.

Attest:                                    Assix International, Inc.

By _____        By _____
      Name:                                  Name: President
      Title:                                 Title:

Attest:                                    Registrar and Transfer Company

By _____        By _____
      Name:                                  Name:  William Tatler
      Title:                                 Title:  Vice President

- 38 -

Attest:                                   Assix International, Inc.

By_____               By_____
    Name:                                  Name:
    Title:                                 Title:


Attest:                                   Registrar and Transfer Company

By _____                By _____
    Name:  Walter M. Boraczek              Name:  William Tatler
    Title:  Vice President                 Title:  Vice President

- 38 -